******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

# STATE OF CONNECTICUT *v.* GEORGE MICHAEL LENIART
## (SC 19809)
## (SC 19811)

Palmer, McDonald, Robinson, D'Auria, Mullins, Kahn and Vertefeuille, Js.*

*Syllabus*

The defendant, who was convicted of capital felony and murder following the disappearance of the victim, appealed from the judgment of conviction, claiming, inter alia, that certain evidentiary rulings substantially affected the jury's verdict and that there was insufficient evidence to sustain his conviction under the common-law corpus delicti rule. At trial, the state presented testimony from A, who had been serving a ten year sentence for a sexual assault involving another victim at the time of the defendant's trial. A testified that he and the defendant had sexually assaulted the victim, a fifteen year old girl, after the three had driven to a secluded wooded location in the defendant's truck. A testified that he last saw the victim in the defendant's truck and that, when he met the defendant the following day, the defendant, who was a lobster fisherman, had confessed to killing the victim, placing her remains in a lobster trap, and dropping the trap into a river. In order to impeach A's credibility, the defendant sought to admit a video recording depicting a police officer interviewing A prior to the administration of a polygraph examination. The defendant claimed that the video was relevant because it showed that A had been promised favorable treatment in exchange for his cooperation. The trial court, however, excluded the video on the ground that it constituted inadmissible polygraph evidence under *State v. Porter* (241 Conn. 57). The state also presented testimony from three individuals who previously had been incarcerated with the defendant. The first of those witnesses, B, testified that the defendant had admitted to choking an intoxicated young girl to death while having sex with her, dismembering her body, and disposing of it in lobster pots in Long Island Sound. The second of those witnesses, D, testified that the defendant told him that the victim's body was in a river and had been eaten by crabs. A, B, and D all testified that they hoped to receive some consideration from the state in exchange for their testimony. The third of those witnesses, C, who was no longer incarcerated at the time of trial, testified that the defendant had admitted to raping and killing a fifteen year old girl on his boat and hiding the body in a well before ultimately dumping it in Long Island Sound. The state also elicited testimony at trial from a thirteen year old victim in a separate case indicating that, six months before the victim's disappearance, the defendant had choked her while raping her. Finally, the state called S, the defendant's ex-wife, who testified that she had asked the defendant whether he was involved in the victim's disappearance and that the defendant had told her that, the less she knew, the better off she was. At trial, the defendant sought to introduce testimony from N, a law professor who had studied issues related to use of incarcerated informants as witnesses in criminal prosecutions. The state objected, and N testified, outside the presence of the jury, that, among other things, the use of such informants is a significant source of wrongful convictions and that inmates may gather information from gossip, other inmates' legal files, or the media in order to fabricate believable, incriminating stories in exchange for favorable treatment. Although N was able to testify about the use of such witnesses in certain other jurisdictions, she acknowledged that she had not studied customs or practices in Connecticut. The trial court ultimately excluded N's testimony, concluding that it invaded the exclusive province of the jury by assessing the credibility of the state's witnesses and that it did not convey any relevant information beyond the ken of the average juror. After closing arguments, the trial court instructed the jury regarding the credibility of criminal informants. On appeal, the defendant raised an unpreserved claim under the corpus delicti rule that the state had failed to set forth sufficient evidence at trial to corroborate his alleged confessions and to establish that the victim was, in fact, dead. The defendant

also claimed that the trial court had improperly excluded the video recording and N's testimony. Although the Appellate Court rejected the defendant's sufficiency claim for lack of preservation, it agreed with both of the defendant's evidentiary claims. Because the Appellate Court found that those evidentiary errors were harmful, it reversed the trial court's judgment and remanded the case for a new trial. Both the state and the defendant, on the granting of certification, appealed to this court. In his appeal, the defendant claimed that the Appellate Court improperly rejected his sufficiency claim under the corpus delicti rule. In its appeal, the state claimed that the Appellate Court incorrectly concluded that the trial court had improperly excluded the video recording and N's testimony. *Held*:

1. The defendant could not prevail on his unpreserved sufficiency claim under this state's common-law corpus delicti rule: the purpose, history, and scope of the corpus delicti rule, in this state as well as in other jurisdictions, supported this court's conclusion that the rule both bars the admissibility of evidence of uncorroborated confessions and imposes a substantive due process requirement, and, therefore, contrary to the Appellate Court's conclusion, the defendant's corpus delicti claim was reviewable on appeal even though it was not properly preserved at trial; moreover, although this court declined the defendant's invitation to specifically require the state to prove the fact of death by evidence independent of a defendant's confession in a murder case under the modern formulation of the corpus delicti rule, in light of circumstances surrounding the victim's disappearance, the testimony of A regarding the sexual assault of the victim and related events, the fact that the defendant had been convicted of sexually assaulting a thirteen year old girl in a separate case, S's testimony, and the similarities between the defendant's confessions as recounted by A, B, D, and C, this court concluded that there was sufficient, corroborating evidence, independent of the defendant's confessions, of the victim's death and of the credibility of those confessions for the jury to have found the defendant guilty beyond a reasonable doubt.

2. The Appellate Court incorrectly concluded that the trial court's improper exclusion of the video recording constituted harmful error: the trial court improperly excluded the video for all purposes under *Porter*, as that case defined inadmissible polygraph evidence to include only the results of a polygraph test and the willingness of a witness to undergo such a test, and, accordingly, *Porter* did not categorically preclude the admission of all evidence regarding the pretest interview process; nevertheless, the defendant failed to meet his burden of demonstrating that the exclusion of the video substantially affected the verdict because the polygrapher had repeatedly emphasized the importance of telling the truth while making only infrequent, potentially troubling remarks, A's own testimony on cross-examination by defense counsel provided strong evidence of the powerful incentives that he had to cooperate with the state by freely admitting his own participation in the underlying crimes and his desire for leniency in connection with the unrelated sexual assault conviction, and the state's case against the defendant was otherwise strong.

3. The Appellate Court incorrectly concluded that the trial court had abused its discretion in precluding N's testimony regarding the credibility of incarcerated informants; although the trial court incorrectly concluded that N's testimony would have invaded the exclusive province of the jury by assessing the credibility of witnesses, as N explicitly testified that she had no knowledge of this particular case and that she was not familiar with and did not intend to comment on the testimony of any particular witness, the trial court reasonably concluded that the relevant information presented through N's testimony was not beyond the ken of the average juror, as the trial court could have credited N's testimony that any fundamental concerns regarding the reliability of informant testimony have been exposed by the media and are well understood outside of the jailhouse, and as any concepts relating to the credibility of incarcerated informants that were directly and specifically applicable to this case would have been made familiar to the jury through common sense, other information presented at trial, and the trial court's instructions.

*State* v. *Uretek, Inc.* (207 Conn. 706), to the extent that it suggested that corpus delicti claims do not implicate fundamental due process rights and, therefore, are not reviewable on appeal unless preserved at trial,

overruled.

*(One justice concurring separately; three justices*
*concurring in part and dissenting in part*
*in two separate opinions)*

Argued May 2, 2018—officially released September 10, 2019

*Procedural History*

Substitute information charging the defendant with three counts of the crime of capital felony and one count of the crime of murder, brought to the Superior Court in the judicial district of New London and tried to the jury before *Jongbloed, J.*; thereafter, the court granted the state's motion to preclude certain evidence; verdict and judgment of guilty, from which the defendant appealed; subsequently, the Appellate Court, *Sheldon* and *Prescott, Js.*, with *Flynn, J.*, concurring in part and dissenting in part, reversed the judgment of the trial court and remanded the case for a new trial, and the state and the defendant, on the granting of certification, filed separate appeals with this court. *Reversed in part*; *further proceedings*.

*Stephen M. Carney*, senior assistant state's attorney, with whom, on the brief, was *Michael L. Regan*, state's attorney, for the appellant in Docket No. SC 19809 and the appellee in Docket No. SC 19811 (state).

*Lauren Weisfeld*, chief of legal services, for the appellee in Docket No. SC 19809 and the appellant in Docket No. SC 19811 (defendant).

*Opinion*

MULLINS, J. Following a jury trial, the defendant, George Michael Leniart, was convicted of murder in violation of General Statutes § 53a-54a (a) and three counts of capital felony in violation of General Statutes (Rev. to 1995) § 53a-54b (5), (7), and (9), as amended by Public Acts 1995, No. 95-16, § 4.[1] The Appellate Court reversed the judgment of conviction and remanded the case for a new trial, holding that the trial court improperly excluded (1) a videotape that depicted a police officer interviewing a crucial prosecution witness prior to the administration of a polygraph examination, and (2) certain expert testimony proffered by the defendant regarding the reliability of jailhouse informant testimony. *State* v. *Leniart*, 166 Conn. App. 142, 146–47, 140 A.3d 1026 (2016). The Appellate Court also considered and rejected the defendant's claim regarding the sufficiency of the underlying evidence. Id. We granted both the state's and the defendant's petitions for certification to appeal.

In its certified appeal, the state challenges the conclusion of the Appellate Court that the videotape and expert testimony were improperly excluded. In his appeal, the defendant contends that he is entitled to a judgment of acquittal because, under the common-law corpus delicti rule, the state failed to set forth sufficient evidence, independent of the defendant's own admissions, to establish that the alleged victim was, in fact, dead.

We reverse the judgment of the Appellate Court with respect to the state's appeal and affirm the judgment with respect to the defendant's appeal. Specifically, we conclude that (1) although the defendant's corpus delicti claim is not merely evidentiary and, therefore, is reviewable on appeal, the Appellate Court correctly concluded that there was sufficient evidence to support the conviction, (2) although the Appellate Court correctly concluded that the trial court's exclusion of the videotape was improper, the exclusion of that evidence was harmless, and (3) the Appellate Court incorrectly concluded that the trial court had abused its discretion in precluding the expert testimony proffered by the defendant.

The following facts, which the jury reasonably could have found, and procedural history are relevant to the claims before us. On May 29, 1996, the victim,[2] who was then fifteen years old, snuck out of her parents' home to meet Patrick J. Allain, a teenage friend also known as P.J., so that they could smoke marijuana, drink alcohol, and have sex. The two teenagers were picked up by the defendant, who at the time was thirty-three years old. They then drove to a secluded, wooded location near the Mohegan-Pequot Bridge in the defendant's truck.

While parked, the victim and Allain kissed, drank beer, and smoked marijuana. At some point, the defendant, who had told Allain that he was in a cult, called Allain aside and told him that he wanted "to do" the victim and that he "wanted a body for the altar."

Allain, who feared the defendant, returned to the truck and informed the victim that he and the defendant were going to rape her. Allain then removed her clothes and had sex with her in the truck while the defendant watched through the windshield. After Allain and the victim finished having sex, the defendant climbed into the truck and sexually assaulted the victim while Allain held her breast. After the assault, the victim pretended not to be upset so that the defendant would not harm her further.

The defendant then drove the teenagers back to Allain's neighborhood. The defendant dropped off Allain near his home, and the victim remained in the truck. The victim never returned home that night and was never seen again, despite a protracted nationwide search by law enforcement. The search also did not recover her body.

Allain subsequently implicated the defendant in the victim's death. As a result, in 2008, the state charged the defendant with murder in violation of § 53a-54a, capital felony in violation of § 53a-54b (5) for murder in the course of a kidnapping, capital felony in violation of § 53a-54b (7) for murder in the course of a sexual assault, and capital felony in violation of § 53a-54b (9) for murder of a person under the age of sixteen. The case was tried to a jury.

The state's case against the defendant included the testimony of four witnesses, who each testified that, at different times, the defendant had admitted, directly or indirectly, to killing the victim. Allain, the state's key witness, was serving a ten year sentence for an unrelated sexual assault at the time of trial. He testified that, on the afternoon following the previously described events, the defendant had asked to meet with him on a path behind the Mohegan School in Montville. At that meeting, the defendant admitted that "he had to do [the victim]—to get rid of her." The defendant described to Allain how, after dropping Allain off the night before, he had pretended to run out of gas near the path.[3] He then ripped the license plates off his truck, dragged the frantic victim into the woods, and choked her. Later that evening, at a second meeting, the defendant further confessed to Allain that he had killed the victim and had "erased" her by placing her remains in a lobster trap and dropping them into the mud at the bottom of the Thames River. The defendant was a lobster fisherman at the time.

Like Allain, the state's three other confession witnesses either were inmates at the time of trial or pre-

viously had been incarcerated. Each of these three witnesses had, at some point, been incarcerated with the defendant while he was serving time for an unrelated sexual assault charge. Kenneth S. Buckingham testified that the defendant confided in him that he accidentally had choked an intoxicated young girl to death while having sex with her and that he then dismembered the body and disposed of it in lobster pots "in the sound." Buckingham also testified that a person named P.J. had been with the defendant and that victim prior to the death. Michael S. Douton, Jr., testified that the defendant had told him that the victim "was in the river" and that "they would never convict him because they would never find [her] body," which had been eaten by crabs. Buckingham and Douton, like Allain, each testified that they hoped to receive some consideration from the state in return for their testimony. Zee Y. Ching, Jr., unlike the other witnesses, was not incarcerated or facing legal jeopardy at the time of trial. Ching testified that the defendant admitted that he had raped and killed a fifteen year old girl on his boat and that he had hidden the body in a well before ultimately dumping it in Long Island Sound.

The jury returned a verdict of guilty on all counts. The court merged the verdicts into a single conviction of capital felony and sentenced the defendant to a term of life imprisonment without the possibility of release. On appeal to the Appellate Court, the defendant raised various challenges to the trial court's evidentiary rulings and also claimed, relying in part on the common-law corpus delicti rule, that the evidence was insufficient to sustain his conviction. *State* v. *Leniart*, supra, 166 Conn. App. 146–49. The Appellate Court rejected the defendant's sufficiency claim but concluded that the trial court incorrectly had excluded the polygraph pretest interview videotape, as well as expert testimony relating to the credibility of jailhouse informants. The Appellate Court then concluded that those evidentiary rulings substantially affected the verdict and, accordingly, remanded the case for a new trial.[4]

We granted the state's petition for certification to appeal, limited to the questions of whether the Appellate Court correctly concluded that the trial court had erroneously excluded the polygraph pretest interview videotape and expert testimony regarding jailhouse informant testimony and that those rulings substantially affected the verdict. *State* v. *Leniart*, 323 Conn. 918, 150 A.3d 1149 (2016). We also granted the defendant's petition for certification to appeal, limited to the question of whether the Appellate Court properly applied the corpus delicti rule in concluding that there was sufficient evidence to sustain his conviction of murder and capital felony. *State* v. *Leniart*, 323 Conn. 918, 918–19, 149 A.3d 499 (2016). Additional facts and procedural history will be set forth as necessary.

# I
## CORPUS DELICTI RULE

We first consider the claim raised in the defendant's appeal. Before the Appellate Court, the defendant argued, for the first time; see footnote 7 of this opinion; that the evidence was insufficient to sustain his conviction because, under the common-law corpus delicti rule, the state had failed to establish beyond a reasonable doubt each element of the crimes charged. As we explain more fully hereinafter, the corpus delicti rule, although defined and applied differently in other jurisdictions, and even in our prior cases, generally "prohibits a prosecutor from proving the [fact of a transgression] based solely on a defendant's extrajudicial statements."[5] Black's Law Dictionary (7th Ed. 1999) p. 346. In the present case, the defendant argued that there was no evidence, aside from his various alleged admissions, that the victim actually was dead, which is the corpus delicti of murder. See *State* v. *Tillman*, 152 Conn. 15, 20, 202 A.2d 494 (1964) ("[T]he corpus delicti consists of the occurrence of the specific kind of loss or injury embraced in the crime charged. . . . [I]n a homicide case, the corpus delicti is the fact of the death, whether or not feloniously caused, of the person whom the accused is charged with having killed or murdered." [Footnote omitted.]).

In order to identify the specific version of the rule to be applied in the present case, the Appellate Court reviewed the purpose and history of the corpus delicti rule. Believing itself to be bound by cases such as *State* v. *Uretek, Inc.*, 207 Conn. 706, 543 A.2d 709 (1988) (*Uretek*), a majority of the Appellate Court held that the corpus delicti rule is merely an evidentiary rule that bars the use of a defendant's own uncorroborated extrajudicial confessions or admissions[6] to prove the corpus delicti of a crime. *State* v. *Leniart*, supra, 166 Conn. App. 151, 159. Because, in its view, the rule is one of admissibility, the Appellate Court majority concluded that the defendant had abandoned his corpus delicti claim by failing to object at trial to the testimony of Allain, Buckingham, Ching, and Douton, each of whom testified that the defendant had confessed to killing the victim. Id., 151.

Judge Flynn, writing a separate opinion concurring in part and dissenting in part, concluded that the corpus delicti rule is a hybrid rule—it is an evidentiary rule, insofar as it provides that a defendant's confession is inadmissible in the absence of some corroborating evidence that a crime has been committed, but it also is a substantive rule of criminal law providing that a defendant cannot be convicted of a crime when the only evidence that the crime has been committed is the defendant's own uncorroborated confession. See id., 236–37. Judge Flynn also opined that the rule should

be applied more strictly with respect to murder than with respect to other crimes, in that the state should be required to set forth independent evidence of the victim's death and not simply extrinsic evidence that tends to establish the credibility of the defendant's confession. Id., 236. All three members of the Appellate Court panel agreed, however, that the state had, in any event, set forth sufficient, independent evidence of the victim's death to satisfy the corpus delicti rule, regardless of how that rule is defined. Id., 171–75; id., 237 (*Flynn, J.*, concurring in part and dissenting in part).

In his certified appeal, the defendant asks us to clarify that (1) the corpus delicti rule is, at least in part, a substantive rule and, therefore, that his claim is reviewable on appeal despite his failure to object to the admission of testimony regarding the confessions at trial, and (2) the rule bars a murder conviction on the basis of a defendant's confession in the absence of independent evidence that the alleged victim is dead. The defendant further contends that, in the present case, there was not sufficient extrinsic evidence to establish that the victim was dead. We agree with the defendant and Judge Flynn that our state's common-law corpus delicti rule is a hybrid rule that has both substantive and evidentiary components, and that unpreserved corpus delicti claims are, therefore, reviewable on appeal. We agree with the Appellate Court majority, however, that the rule does not impose a higher standard of proof with respect to murder than with respect to other crimes. Finally, we conclude that there was sufficient, independent corroborating evidence both of the victim's death and of the credibility of the defendant's confessions for the jury to have found the defendant guilty beyond a reasonable doubt.[7] Accordingly, we affirm the judgment of the Appellate Court with respect to this claim.

A

Assuming, arguendo, that the state is correct that the defendant's corpus delicti claim was not preserved at trial, we must determine as a threshold matter whether the corpus delicti rule is merely evidentiary or whether it encompasses a substantive component that invokes the defendant's due process rights. If it is merely an evidentiary rule of admissibility, then the defendant's failure to raise his claim at trial precludes appellate review. See, e.g., *State* v. *Gonzalez*, 315 Conn. 564, 591, 109 A.3d 453, cert. denied,    U.S.    , 136 S. Ct. 84, 193 L. Ed. 2d 73 (2015). On the other hand, if the rule establishes, as a substantive matter, the type or degree of evidence necessary to establish that elements of a crime have been proven beyond a reasonable doubt, then the defendant's claim is reviewable on appeal regardless of whether he raised it at trial.[8] See, e.g., *State* v. *Adams*, 225 Conn. 270, 275–76 n.3, 623 A.2d 42 (1993) (unpreserved insufficiency of evidence claims implicate due process rights and are reviewable on

appeal). Whether the corpus delicti rule is evidentiary, substantive, or a hybrid of the two is a question of law that we review de novo.

The parties and the Appellate Court have identified four factors that are relevant to the question of whether our state's corpus delicti rule has both evidentiary and substantive components: this court's precedents, the approach followed by other jurisdictions, the rationales that underlie the rule, and issues regarding how the rule is applied in practice. Our review of these factors compels the conclusion that corpus delicti is a hybrid rule and, therefore, that the defendant's corpus delicti claim is reviewable.[9]

1

The Appellate Court began by comprehensively "reviewing the purpose, history, and present scope of the corpus delicti rule in Connecticut." *State* v. *Leniart*, supra, 166 Conn. App. 151–52. Although we have not previously analyzed the issue in any depth, our corpus delicti decisions, if not entirely consistent, generally support the conclusion that the rule is a hybrid one that both bars the admissibility of uncorroborated confession evidence and imposes a substantive due process requirement. In one case, for example, the defendant claimed that "there was insufficient extrinsic evidence of the corpus delicti to warrant the court's admission of his confessions . . . ." *State* v. *Doucette*, 147 Conn. 95, 97, 157 A.2d 487 (1959), overruled in part by *State* v. *Tillman*, 152 Conn. 15, 20, 202 A.2d 494 (1964). In *Doucette*, this court agreed that "[p]roperly this [extrinsic] evidence should be introduced and the court satisfied of its substantial character and sufficiency to render the confession admissible, before the latter is allowed in evidence." (Internal quotation marks omitted.) *State* v. *Doucette*, supra, 100. At the same time, we made clear in describing the rule that it not only governs the admission of confession evidence but also sets the conditions for obtaining a conviction. "[T]he corpus delicti," we said, "cannot be established by the [extrajudicial] confession of the defendant unsupported by corroborative evidence." (Internal quotation marks omitted.) Id., 98–99. "The Connecticut rule, which we reaffirm, is that, although the confession is evidence tending to prove both the fact that the crime [charged] was committed . . . and the defendant's agency therein, *it is not sufficient of itself to prove the former*, and, without evidence aliunde of facts also tending to prove the corpus delicti, *it is not enough to warrant a conviction* . . . ." (Emphasis added; internal quotation marks omitted.) Id., 99.[10]

Since this court decided *Doucette*, a number of our decisions have stated or implied that the corpus delicti rule encompasses both substantive and evidentiary components and, therefore, that corpus delicti claims are reviewable even if not raised at trial. See, e.g., *State*

v. *Farnum*, 275 Conn. 26, 33, 878 A.2d 1095 (2005); *State* v. *Grant*, 177 Conn. 140, 144, 411 A.2d 917 (1979); *State* v. *Tillman*, supra, 152 Conn. 18; but see *State* v. *Oliveras*, 210 Conn. 751, 757, 557 A.2d 534 (1989) (leaving open reviewability question with respect to recently reformulated corpus delicti rule). By contrast, in no recent decision have we indicated that the rule is exclusively evidentiary or that unpreserved corpus delicti claims are unreviewable on appeal.

The Appellate Court majority, concluding that the corpus delicti rule is purely evidentiary, understandably believed itself to be bound by *State* v. *Uretek, Inc.*, supra, 207 Conn. 706.[11] See *State* v. *Leniart*, supra, 166 Conn. App. 161. In *Uretek*, we declined to consider the named defendant's corpus delicti argument because the defendant had not preserved the argument at trial. *State* v. *Uretek, Inc.*, supra, 713. Our review of the issue was limited to the following sentence: "[The defendant's] corpus delicti claim does not implicate a fundamental constitutional right, and, therefore, this court will not review this contention. *State* v. *George*, 194 Conn. 361, 372, 481 A.2d 1068 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 963, 83 L. Ed. 2d 968 (1985); *State* v. *Gooch*, 186 Conn. 17, 18, 438 A.2d 867 (1982); *State* v. *Evans*, 165 Conn. 61, 70, 327 A.2d 576 (1973)." *State* v. *Uretek, Inc.*, supra, 713.

We agree with the defendant that *Uretek* must be overruled to the extent that it suggested that corpus delicti claims do not implicate fundamental due process rights and, therefore, are not reviewable on appeal unless preserved at trial. The decision provided no support for that conclusory proposition, which, as we have discussed, was inconsistent with both our prior and subsequent corpus delicti cases. Notably, none of the three cases that *Uretek* cited in support of that proposition involved or even referenced the corpus delicti rule. In addition, *Uretek* was decided prior to *State* v. *Adams*, supra, 225 Conn. 275–76 n.3, in which we ruled that unpreserved insufficiency of the evidence claims are always reviewable on appeal.

2

It also is instructive to consider how the corpus delicti rule has been construed and applied by our sister states and the federal courts. Of those states that continue to apply a corpus delicti rule, the vast majority treat the rule as either substantive or a substantive and evidentiary hybrid. See, e.g., *Langevin* v. *State*, 258 P.3d 866, 873 (Alaska App. 2011) ("[M]ost American jurisdictions follow the implicit element approach to corpus delicti. . . . Under this approach, corpus delicti is an element of the government's proof—and the general rule is that a defendant is entitled to a [judgment] of acquittal if the government fails to offer proof of each element of the crime." [Citations omitted; internal quotation marks omitted.]); see also 1 K. Broun, McCormick on Evidence

(7th Ed. 2013) § 145, p. 804; 1 W. LaFave, Substantive Criminal Law (2d Ed. 2003) § 1.4 (b), p. 31. By contrast, only a handful of our sister states treat the rule solely as one of admissibility.[12]

In addition, although the United States Supreme Court has not expressly resolved the question, several federal circuit courts of appeals understand the high court to have adopted a hybrid version of the rule. See, e.g., *United States* v. *Dickerson*, 163 F.3d 639, 642 (D.C. Cir. 1999) (explaining that United States Supreme Court has "created something of a hybrid rule having elements both of admissibility and sufficiency"); see also *United States* v. *McDowell*, 687 F.3d 904, 912 (7th Cir. 2012) ("[t]he corroboration principle sometimes comes into play in the trial court's decision to admit the defendant's confession and also if he later challenges the sufficiency of the evidence"); *United States* v. *Singleterry*, 29 F.3d 733, 737 (1st Cir.) (discussing dual nature of rule), cert. denied, 513 U.S. 1048, 115 S. Ct. 647, 130 L. Ed. 2d 552 (1994). Moreover, every federal circuit treats the corpus delicti rule as having some substantive component. See generally *United States* v. *Marshall*, 863 F.2d 1285, 1287 (6th Cir. 1988) (reviewing topic and citing cases). That so many of our sister courts treat the rule as substantive not only provides persuasive authority for following that approach but also mitigates any concerns that the state has raised; see part I A 4 of this opinion; that applying the rule substantively would be impracticable or inappropriate.

3

We also agree with McCormick on Evidence, which posits that the rationales that gave rise to and continue to justify the corpus delicti rule support treating that rule as substantive. See 1 K. Broun, supra, § 145, p. 805.[13] "The rationale for the requirement is that inculpatory confessions and admissions are frequently unreliable for many reasons, including coercion, delusion, neurosis, self-promotion, or protection of another person. Jurors find such statements inherently powerful, however, and may vote to convict based upon such statements alone. . . . The [corpus delicti] rule, which is intended to prevent convictions of innocent defendants, also encourages better law enforcement because police and prosecutors cannot rely solely on a defendant's statements to prove a case." (Citation omitted.) *United States* v. *Bryce*, 208 F.3d 346, 354–55 (2d Cir. 1999).

Treating the corpus delicti rule as evidentiary is fully consistent with the purpose of the rules of evidence, which is to bar unreliable evidence offered to influence the trier of fact. See, e.g., *Pagano* v. *Ippoliti*, 245 Conn. 640, 656, 716 A.2d 848 (1998) (*McDonald, J.*, dissenting); see also *State* v. *Beverly*, 224 Conn. 372, 375, 618 A.2d 1335 (1993) ("[t]he corpus delicti rule is a rule of evidence"). However, as we discuss at greater length hereinafter; see part I B 1 of this opinion; the rule did not

originate exclusively, or even primarily, to assist the jury in assessing the credibility of confession evidence, or even to ensure that false confessions are not entered into evidence. Rather, the rule has a more fundamental purpose, namely, to avoid the patent injustice of convicting an innocent person—frequently one who either is mentally ill or has been subject to coercive interrogation—of an imaginary crime. See *State* v. *Arnold*, 201 Conn. 276, 287, 514 A.2d 330 (1986); D. Moran, "In Defense of the Corpus Delicti Rule," 64 Ohio St. L.J. 817, 817 (2003). Those concerns lie at the core of our due process protections, and we can perceive no reason why the injustice of trying and convicting a possibly troubled individual for a nonexistent crime should be compounded by denying that individual the opportunity for appellate review when his or her attorney fails to raise a timely and appropriate objection.

Furthermore, to the extent that a purpose of the rule is to eliminate incentives for law enforcement to obtain false confessions through coercive means, while at the same time promoting more thorough investigative practices, corpus delicti fairly may be characterized as a type of constitutional prophylactic rule. See T. Mullen, "Rule Without Reason: Requiring Independent Proof of the Corpus Delicti as a Condition of Admitting an Extrajudicial Confession," 27 U.S.F. L. Rev. 385, 401 (1993) (describing purposes of rule); see also C. Rogers, "Putting Meat on Constitutional Bones: The Authority of State Courts To Craft Constitutional Prophylactic Rules Under the Federal Constitution," 98 B.U. L. Rev. 541, 548, 555–56 (2018) (defining constitutional prophylactic rules). We are not aware of any such rule the alleged violation of which must be raised at trial in order to be reviewable on appeal. See *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989) (establishing requirements for defendant to prevail on claim of constitutional error not preserved at trial). Accordingly, the rationales that underlie the rule are fully consistent with the majority position that corpus delicti is a substantive rule of criminal law to be applied in reviewing the sufficiency of the state's evidence and not merely an evidentiary rule regarding the admissibility of confessions.

4

We next consider several reasons offered by the state and the Appellate Court majority as to why corpus delicti should be treated solely as a rule of admissibility. First, the Appellate Court decision starts with the premise that, if the rule implicates the sufficiency of the evidence, then the jury must be involved in some way in resolving corpus delicti questions. See *State* v. *Leniart*, supra, 166 Conn. App. 166. But, that line of reasoning proceeds, courts typically do not instruct jurors that they must find the corpus delicti of a crime established independent of the defendant's own incriminating statements. Id. In addition, the Appellate Court majority

reasoned that, if jurors are to be tasked with finding that the corpus delicti has been established independent of any confession evidence, then they, having already heard the defendant's confessions, would be required to set those confessions aside while objectively evaluating the strength of any independent, corroborating evidence. The Appellate Court majority opined that that expectation is not realistic. Id., 167–68. Thus, the court concluded, the rule must not be substantive.

We are not persuaded that the Appellate Court's starting premise is correct. Many of the courts that treat the corpus delicti rule as a substantive rule that implicates the sufficiency of the evidence do not involve the jury in its application. See, e.g., *United States* v. *McDowell*, supra, 687 F.3d 912 ("[W]e have held that the district court is not obligated to instruct the jury on the requirement of corroboration. . . . Following the lead of two other circuits, we concluded . . . that the matter was better left to the trial judge, and that the standard instructions regarding the government's burden of proof and the presumption of innocence are generally sufficient." [Citation omitted.]). In those jurisdictions, the trial court makes an initial determination as to whether there is sufficient corroboration to allow the jury to hear the defendant's confessions. If the court allows the confessions—and thus the case—to reach the jury, the jury is then tasked with assessing whether all of the evidence, including the confessions and any extrinsic evidence, is sufficient to establish the defendant's guilt beyond a reasonable doubt.

In *United States* v. *Dickerson*, supra, 163 F.3d 642–43, the United States Court of Appeals for the Tenth Circuit explained why the fact that the rule involves a substantive component that implicates the defendant's due process rights does not require the involvement of the jury in its application. Corpus delicti, that court explained, is "essentially . . . a duty imposed upon courts to ensure that the defendant is not convicted on the basis of an uncorroborated out-of-court-statement." Id., 642. In this respect, the rule places the trial court in the same gatekeeping role that it occupies in deciding a motion for a judgment of acquittal. Id., 643. In that capacity, the court must determine whether there is sufficient evidence to support a finding of guilt before sending the case to the jury. As the court noted in *Dickerson*, however, "no one thinks it follows from this that the jury must be given an opportunity to reconsider for itself the judge's decision on a motion for judgment of acquittal." Id. The same logic applies, a fortiori, to the corpus delicti rule, which requires only that the trial court make the threshold determination that there are some "corroborating facts [that] tend to produce a confidence in the truth of the confession . . . ." (Internal quotation marks omitted.) *State* v. *Hafford*, 252 Conn. 274, 317, 746 A.2d 150, cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89 (2000); see also id. ("it is

sufficient if the corroboration merely fortifies the truth of the confession" [internal quotation marks omitted]).

The Appellate Court majority also was of the view that, because "the rule itself is not constitutional in nature and jurisdictions are free to abandon it altogether . . . it makes little sense to characterize it as an implicit element of the state's case that is subject to appellate review like all other unpreserved sufficiency of the evidence claims." *State* v. *Leniart*, supra, 166 Conn. App. 167. In a footnote, the majority acknowledged, however, that the rule could take on constitutional implications if the legislature were to formally adopt it. Id., 167 n.19.

We do not agree that the question of whether the corpus delicti rule is substantive in nature and, thus, implicates the defendant's constitutional rights, hinges on whether it has been formally codified. It is true that "[t]he adoption of the comprehensive Penal Code in 1969 abrogated the common-law authority of Connecticut courts to impose criminal liability for conduct not proscribed by the legislature." *Luurtsema* v. *Commissioner of Correction*, 299 Conn. 740, 772, 12 A.3d 817 (2011). At the same time, however, the savings clause to the Penal Code provides, and our cases recognize, that the common law is preserved under the code unless clearly preempted; the code does not bar our courts from "recognizing other principles of criminal liability or other defenses not inconsistent with" statute. General Statutes § 53a-4; see, e.g., *State* v. *Terwilliger*, 314 Conn. 618, 654, 104 A.3d 638 (2014) (self-defense); *State* v. *Courchesne*, 296 Conn. 622, 679–88 and n.44, 998 A.2d 1 (2010) (born alive principle); *State* v. *Walton*, 227 Conn. 32, 45, 630 A.2d 990 (1993) (vicarious liability of conspirator). As the cited examples indicate, common-law rules and principles that are neither constitutionally required nor expressly adopted by statute nevertheless may clarify the elements of, or defenses to, a crime in ways that have constitutional implications. The corpus delicti rule is no different.

Finally, the state argues that it would be fundamentally unfair to review unpreserved corpus delicti claims because prosecutors will not have been put on notice at the time of trial that there may be a corpus delicti problem and, therefore, will not have the opportunity to identify and introduce the additional evidence necessary to corroborate a defendant's naked confession. We trust that the present opinion will serve as adequate notice. See *Burks* v. *United States*, 437 U.S. 1, 16, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978) ("the prosecution cannot complain of prejudice, for it has been given one fair opportunity to offer whatever proof it could assemble").

For all of these reasons, we conclude that the corpus delicti rule is a hybrid rule that not only governs the admissibility of confession evidence but also imposes

a substantive requirement that a criminal defendant may not be convicted solely on the basis of a naked, uncorroborated confession. Accordingly, the defendant's corpus delicti claim is reviewable even though it was not properly preserved at trial.

## B

Having established that our corpus delicti rule has a substantive component that implicates the defendant's due process rights and, therefore, that his claim is reviewable, we now turn our attention to the merits of his claim. To resolve the claim, we first must address another dispute between the parties, and among the Appellate Court panel, regarding how the rule applies in murder cases.

### 1

The defendant contends, in essence, that the corpus delicti rule imposes different, more stringent standards with respect to murder than with respect to less serious crimes. Before we set forth the defendant's argument, it will be helpful briefly to review the evolution of the corpus delicti rule in Connecticut.

Although our cases contain earlier references to the rule; see, e.g., *State* v. *Carta*, 90 Conn. 79, 83, 96 A. 411 (1916); the corpus delicti rule was first fully articulated in 1933. See *State* v. *LaLouche*, 116 Conn. 691, 166 A. 252 (1933), overruled in part by *State* v. *Tillman*, 152 Conn. 15, 20, 202 A.2d 494 (1964). In *LaLouche*, this court characterized the rule as follows: "Undoubtedly the general rule is that the corpus delicti cannot be established by the [extrajudicial] confession of the defendant unsupported by corroborative evidence. . . . There are cases which hold in effect that it must be established by evidence independent of the defendant's confession and that without such proof evidence of the confession is inadmissible. . . .

"The overwhelming weight of authority and of reason, however, recognizes that such a confession or admission may be considered in connection with other evidence to establish the corpus delicti, and that it is not necessary to prove it by evidence entirely independent and exclusive of the confession. . . . In order to warrant a conviction in a given case, it must be shown (1) that a crime has been committed, and (2) that the person charged therewith was the active agent in the commission thereof. But, while it is necessary that both of said essential facts should be proved beyond a reasonable doubt, it does not follow that each must be proved independently of, and apart from, the other, or that either must be proved independently of, and without regarding the confession of the person charged with the crime. The confession is evidence tending to prove both the fact that the crime was committed and the defendant's agency therein. . . . But it is not sufficient of itself to prove the former, and, without [independent]

evidence . . . of facts also tending to prove the corpus delicti, it is not enough to warrant a conviction. There must be such extrinsic corroborative evidence as will, when taken in connection with the confession, establish this fact in the minds of the jury beyond a reasonable doubt.

"The independent evidence must tend to establish that the crime charged has been committed and must be material and substantial, but need not be such as would establish the corpus delicti beyond a reasonable doubt apart from the confession. . . . [T]his evidence should be introduced and the court satisfied of its substantial character and sufficiency to render the confession admissible, before the latter is allowed in evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *LaLouche*, supra, 116 Conn. 693–95; see also *State* v. *Doucette*, supra, 147 Conn. 98–100 (reaffirming rule).

In the decades since we decided *LaLouche* and *Doucette*, and consistent with the modern trend, we have reduced in several respects the burden that the corpus delicti rule imposes on the state in prosecuting a crime.[14] First, in *State* v. *Tillman*, supra, 152 Conn. 20, we joined a small handful of jurisdictions to have departed from the traditional rule that the state must establish, by independent evidence,[15] both that an injury or loss occurred and that the loss was feloniously caused.[16] In *Tillman*, we held that the corpus delicti that must be established by independent evidence encompasses only the former element, namely, the specific kind of loss or injury embraced in the crime charged. Id. "Under [this definition], in a homicide case, the corpus delicti is the fact of the death, whether or not feloniously caused, of the person whom the accused is charged with having killed or murdered." Id.; but see *State* v. *Courchesne*, supra, 296 Conn. 791 n.5 (*Zarella, J.*, concurring in part and dissenting in part) (adhering to traditional rule that corpus delicti includes fact that "death was produced through criminal agency" [internal quotation marks omitted]).

Next, in *State* v. *Harris*, 215 Conn. 189, 193–94, 575 A.2d 223 (1990), we modified the rule as it applies to crimes, such as driving under the influence, that proscribe certain undesirable conduct but do not necessarily entail any particular injury or loss. Specifically, relying on the decision of the United States Supreme Court in *Opper* v. *United States*, 348 U.S. 84, 75 S. Ct. 158, 99 L. Ed. 101 (1954), we concluded that, for crimes of that sort, the state need not establish the corpus delicti of the crime through extrinsic evidence. Rather, the state need only "introduce substantial independent evidence [that] would tend to establish the trustworthiness of the [defendant's] statement." (Internal quotation marks omitted.) *State* v. *Harris*, supra, 194.

Most recently, in *State* v. *Hafford*, supra, 252 Conn.

317, we held that this trustworthiness rule set forth in *Harris*, also known as the corroboration rule, now "applies to all types of crimes, not only those offenses that prohibit conduct and do not result in a specific loss or injury." In other words, post-*Hafford*, a confession is now sufficient to establish the corpus delicti of any crime, without independent extrinsic evidence that a crime was committed, as long as there is sufficient reason to conclude that the confession is reliable.

In *Hafford*, we justified this departure from our established corpus delicti jurisprudence by observing that the corroboration rule (1) has been embraced both by the federal courts and by an increasing number of state courts, (2) is favored by a number of respected commentators, and (3) is more reasonable and more workable than the traditional corpus delicti rule. Id., 316–17. At the same time, we expressed confidence that the corroboration rule, as applied in *Harris*, would continue to "fulfill the avowed purpose and reason for the existence of the corpus delicti rule [by] protect[ing] accused persons against conviction of offenses that have not in fact occurred . . . and prevent[ing] errors in convictions based upon untrue confessions alone." (Internal quotation marks omitted.) Id., 316.

The defendant does not deny that, under *Hafford*, the state may rely, in most instances, on the accused's statements to establish all of the elements of a charged crime, as long as there is sufficient, independent evidence to establish the trustworthiness of those statements. The defendant emphasizes, however, that, in *Hafford*, we left open the possibility that extrinsic evidence of the corpus delicti still might be required before a defendant can be convicted of murder on the basis of a confession. Specifically, he draws our attention to a footnote in which this court noted that "proving the trustworthiness of a defendant's confession to a crime resulting in injury or loss often will require evidence of that injury or loss. For example, a confession to a homicide likely would not be trustworthy without evidence of the victim's death." Id., 317 n.23. The Appellate Court majority in the present case dismissed the importance of that statement, concluding that the "cryptic footnote," which was merely dictum, was too conclusory and equivocal to indicate that we intended to carve out an exception to the corroboration rule for murder prosecutions. *State* v. *Leniart*, supra, 166 Conn. App. 156–58. Judge Flynn disagreed, writing that, in his view, independent proof of death should be required in any murder case. Id., 229–32 (*Flynn, J.*, concurring in part and dissenting in part).

At first blush, requiring the prosecution to prove the fact of death by extrinsic evidence in a murder case would seem to be consistent with the history of the corpus delicti rule, which was inspired by two cases— centuries and continents apart—in which defendants

were wrongly convicted of the murders of victims who were still very much alive.[17] See D. Moran, supra, 64 Ohio St. L.J. 829–30; T. Mullen, supra, 27 U.S.F. L. Rev. 399–401; R. Perkins, "The Corpus Delicti of Murder," 48 Va. L. Rev. 173, 173–75 (1962). The first, known as Perry's Case, arose from the disappearance of William Harrison from his home in Chipping Campden, England, in 1660. See generally J. Paget, Legal Recreations: Judicial Puzzles (1876) pp. 37–67. When the septuagenarian Harrison failed to return from his regular two mile walk to collect rents for the Viscountess Campden, a servant, John Perry, was sent to search for him. Id., p. 39. A bloodied band, a torn hat, and a comb belonging to Harrison were found, and Perry was arrested. Id., p. 40. After several interrogations, however, John Perry confessed that he had conspired with his mother and brother to rob Harrison, that his brother had choked Harrison to death, and that he had disposed of the body in a swamp. Id., p. 41. The three Perrys were tried, convicted of Harrison's murder, and hanged within the week. Id., p. 43. Several years later, a haggard Harrison mysteriously reappeared in Campden, claiming to have been captured by men on horseback, transferred to a Turkish ship, and sold into slavery, from which he had ultimately escaped.[18] Id., pp. 44–49.

The second case centers on equally incredible but somewhat less tragic events that took place in Manchester, Vermont. See E. Borchard, Convicting the Innocent: Sixty-Five Actual Errors of Criminal Justice (1932) pp. 14–21. Two brothers, Stephen Boorn and Jesse Boorn, were known to be ill-inclined toward Russel Colvin, their eccentric brother-in-law. Id., p. 14. Colvin vanished one day in May, 1812, while his wife was away, and, after a time, suspicion of foul play fell on Stephen and Jesse. Id., pp. 14–15. Seven years and many rumors and superstitions later, after a dog had dug up some animal bones near the Boorn property, Jesse was interrogated by a justice of the peace and implicated Stephen in Colvin's "murder." Id., pp. 15–16. A jailhouse informant, Silas Merrill, subsequently informed a grand jury that Jesse had confessed to him that both Stephen and Jesse had been involved in Colvin's death. Id., p. 17. Stephen subsequently confessed to killing Colvin and disposing of his remains in a river and under an old tree stump. Id., pp. 17–18. Stephen then was tried, convicted, and sentenced to hang. Id., p. 18.

In that case, however, fortune, together with the slower and more cautiously moving wheels of justice in nineteenth century Vermont, spared Stephen the same fate as the Perrys. Two months before the scheduled execution, one of Stephen's attorneys published an article in the New York Evening Post in an attempt to locate Colvin. Id., p. 18. Through an unlikely confluence of events, Colvin, who may have been mentally ill, was found to be living in New Jersey under a different identity, and Stephen was exonerated. Id., pp. 14, 20–21.

Returning to the question before us, courts and commentators have articulated several rationales for the corpus delicti rule: "(1) protecting the mentally unstable from the consequences of their false confessions, (2) avoiding reliance on repudiated confessions out of concern for voluntariness, and (3) promoting better police work by requiring the prosecution to prove its case without the aid of confessions." T. Mullen, supra, 27 U.S.F. L. Rev. 401. As the Perry and Boorn cases demonstrate, however, the rule originated in response to, and was most powerfully justified by, "a narrow, practical problem: how to ensure that after a murderer was executed the supposed murder victim did not show up to cast doubt on the propriety of the execution." Id., 399.

Those cases also reveal, we think, why it is not necessary to apply the rule more stringently in murder cases than with regard to other crimes. Already, from the time of Perry's Case to that of the Boorns, social progress was such that Stephen Boorn was able to evade the gallows. The longer delay between conviction and execution in nineteenth century Vermont gave Stephen's attorneys a reasonable opportunity to investigate Colvin's disappearance after the condemned repudiated his earlier confession. At the same time, newspapers of mass circulation, such as the New York Evening Post, allowed for a broad and efficient search for the missing "victim."

Now consider modern Connecticut. The horrible that first inspired the rule—a disturbed individual executed after confessing to an imaginary murder—is no longer a concern following the repeal of the death penalty in this state. Although false conviction remains a tragic and ever present possibility, it is no longer a completely irreparable one.

Further, the technological tools that are now available to locate missing persons are truly impressive. When the Internet was still in its infancy, the United States Court of Appeals for the Third Circuit recognized that "[w]orldwide communication and travel today are so facile that a jury may properly take into account the unlikelihood that an absent person, in view of his health, habits, disposition and personal relationships would voluntarily flee, go underground, and remain out of touch with family and friends. The unlikelihood of such a voluntary disappearance is circumstantial evidence entitled to weight equal to that of bloodstains and concealment of evidence." (Internal quotation marks omitted.) *Virgin Islands* v. *Harris*, 938 F.2d 401, 418 (3d Cir. 1991). That statement is all the more true today, with new technologies running the gamut from "Amber Alerts," to biometric identification databases, to social media platforms such as Facebook and Twitter. See *McDuff* v. *State*, 939 S.W.2d 607, 623 (Tex. Crim. App.) ("it is less likely in today's mobile and technological society that a person might vanish and never be heard

from again"), cert. denied, 522 U.S. 844, 118 S. Ct. 125, 139 L. Ed. 2d 75 (1997). That is not to say that people do not still go missing, sometimes for many years. With modern tools and expertise, however, many, if not most, are located quickly.[19] Accordingly, the abolition of the death penalty and the increasing unlikeliness that a living person will disappear without a trace for an extended period of time have mitigated the two most compelling rationales for retaining the traditional, more stringent corpus delicti rule solely with respect to murder prosecutions.

In addition, the same general considerations that have led courts and commentators[20] to question the ongoing vitality of the corpus delicti rule—mostly the fact that the *Miranda* warnings[21] and related constitutional protections have curtailed the use of coercive interrogation techniques by law enforcement—apply to murder no less than to other crimes. Those considerations counsel against carving out a special exception for murder.

Finally, we note that, unlike with many other crimes, in any murder prosecution there necessarily will be at least some modicum of extrinsic evidence to support a defendant's confession, namely, a missing person. We are not aware of, and we doubt that due process would permit, any prosecution charging the murder of a wholly unspecified victim. A person charged with murder must be charged with the murder of some specific victim who must, at the very least, have gone missing for some not insignificant period of time. Accordingly, we decline the defendant's invitation to carve out a special exception to the rule set forth in *State* v. *Harris*, supra, 215 Conn. 193–94, for the crime of murder.

2

We now turn our attention to the defendant's claim that the state failed to set forth sufficient evidence at trial to corroborate his alleged confessions and establish that the victim was, in fact, dead. As previously discussed, the corpus delicti rule, as most recently clarified by this court in *Harris* and *Hafford*, required that the state introduce "substantial independent evidence [that] tend[s] to establish the trustworthiness of the [defendant's] statement[s]." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Hafford*, supra, 252 Conn. 316; see also R. Perkins, supra, 48 Va. L. Rev. 181 ("[prima facie] evidence is sufficient for this purpose, and there are indications in the direction of accepting even less than this" [footnote omitted]). The Appellate Court concluded, and we agree, that there was sufficient, independent corroborating evidence both to permit the trial court to allow the defendant's alleged confessions into evidence and, when considered in tandem with the various confessions, for the jury to find, beyond a reasonable doubt, that the defendant was guilty of the victim's murder. That evidence, which

is more fully set forth in the opinion of the Appellate Court, may be briefly summarized as follows.

First, although it was not required under the rule that we have articulated today; see part I B 1 of this opinion; substantial circumstantial evidence was introduced at trial, wholly independent of the defendant's alleged confessions, tending to show that the victim died around the time of the alleged murder. The fifteen year old victim disappeared suddenly and without warning on May 29, 1996. She left home that night without taking any money, clothing, or personal belongings, despite the fact that nearly $1000 was available in the house. The jury also reasonably could have found, on the basis of the evidence presented at trial, that she enjoyed her family, friends, life, and routines in Montville and had no desire to run away from home or to commit suicide.

At the time of trial, she had been missing for more than thirteen years, without having made any known contact with family or friends, and a nationwide search had failed to locate her or to flag any use of her social security number.[22] See *Virgin Islands* v. *Harris*, supra, 938 F.2d 417 (in murder cases in which body is never found, victim's failure to maintain habits and regular contact with family and friends is important extrinsic evidence of corpus delicti). In addition, Allain testified that, the day after the victim disappeared, he discovered her shoe on the wooded path where the defendant had taken him. All of this tended to support the conclusion that the victim had been murdered rather than running away from home.

In addition, aside from relating several of the defendant's alleged confessions, Allain provided other independent support for the conclusion that the victim had been killed. Allain testified that both he and the defendant had raped the victim on the evening in question, and that he had left the victim alone in the defendant's company. That testimony, if credited, established that the defendant already had assaulted the victim that night and that he had both the motive and the opportunity to kill her. See, e.g., *State* v. *Farnum*, supra, 275 Conn. 34 (evidence of motive deemed corroborative of confession).

Allain also testified that the defendant, prior to sexually assaulting the victim, had stated that he "wanted to do her" and that "we need a body." The corpus delicti rule generally does not apply so as to bar statements that an accused made prior to committing the alleged crime. See *Warszower* v. *United States*, 312 U.S. 342, 347, 61 S. Ct. 603, 85 L. Ed. 876 (1941); see also *State* v. *Farnum*, supra, 275 Conn. 35 (prior statement of intent to commit crime deemed corroborative of confession). At the same time, the defendant, when interviewed by the police, acted in a manner that could be interpreted as evidencing a consciousness of guilt, such as by questioning whether Allain had implicated him

in the victim's disappearance and volunteering information to cast aspersions on Allain.

Moreover, at the time of trial, the defendant already had been convicted of sexually assaulting a thirteen year old girl. That victim testified in the present case that the defendant, six months prior to the victim's disappearance, had choked her into unconsciousness while raping her. She further testified that the defendant, after raping her in his trailer, threatened that, if she tried to leave, he would hunt her down, find her, and kill her. Where, as here, there is a question as to whether a crime has been committed and of the improbability of alternative, innocuous explanations for a loss, the fact that the accused has committed other, similar crimes may help to establish the corpus delicti of the charged offense. *United States* v. *Woods*, 484 F.2d 127, 136 (4th Cir. 1973), cert. denied, 415 U.S. 979, 94 S. Ct. 1566, 39 L. Ed. 2d 875 (1974); *Matthews* v. *Superior Court*, 201 Cal. App. 3d 385, 392, 247 Cal. Rptr. 226 (1988); see also Conn. Code Evid. § 4-5 (c) (evidence of other crimes admissible to demonstrate absence of accident and to corroborate crucial prosecution testimony).

Second, aside from this independent evidence that tends to establish that the victim was dead (and that the defendant was her killer), the Appellate Court identified various facts and factors that corroborate the defendant's inculpatory statements. See *State* v. *Leniart*, supra, 166 Conn. App. 170–74. Four different witnesses—Allain, Buckingham, Douton, and Ching—all testified that the defendant had admitted to them that he had killed the victim, or someone fitting her description, and disposed of her remains in a body of water.[23] Several of these witnesses testified that the defendant claimed to have disposed of the body in a lobster trap or fed the victim's remains to crabs. That testimony is consistent with the fact that the defendant was employed as a lobster fisherman.

The jury may have found Ching's testimony to be especially credible insofar as that witness was no longer in prison, on probation or parole, and had no charges pending against him when he came forward to relate the defendant's confession to law enforcement. In addition, the fact that the defendant's most significant and substantial confessions were volunteered to Allain, an accomplice to the sexual assault of the victim, rather than to an investigating officer, endows those confessions with "a strong inference of reliability . . . ."[24] (Internal quotation marks omitted.) *Kaneshiro* v. *United States*, 445 F.2d 1266, 1270 (9th Cir.), cert. denied, 404 U.S. 992, 92 S. Ct. 537, 30 L. Ed. 2d 543 (1971).

Finally, the defendant's ex-wife, Vicki Staplins, testified that, when she asked the defendant whether he was involved in the victim's disappearance, "[h]e told

me the less I knew, the better off I was." The jury reasonably may interpret statements of this sort as evidence of the defendant's consciousness of guilt. See, e.g., *People* v. *Ortiz*, Docket No. B257413 (LDR), 2016 WL 1178972, *16 (Cal. App. March 25, 2016), review denied, California Supreme Court, Docket No. S234113 (July 13, 2016).

Considered in the light most favorable to sustaining the verdict, this evidence was more than sufficient to corroborate the defendant's various confessions and, when viewed in tandem with those confessions, to sustain the conviction.

## II

## EXCLUSION OF PRETEST INTERVIEW VIDEOTAPE

We next consider the state's appeal, in which it claims that the Appellate Court improperly held that the defendant is entitled to a new trial because the trial court's exclusion of Allain's polygraph pretest interview videotape constituted harmful error. The Appellate Court concluded that (1) a recording of a polygraph pretest interview does not qualify as "polygraph evidence" for purposes of *State* v. *Porter*, 241 Conn. 57, 93–94, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998) (holding that polygraph evidence is per se inadmissible for all purposes in all trial court proceedings), and (2) the trial court's exclusion of the videotape pursuant to *Porter* was not harmless error. *State* v. *Leniart*, supra, 166 Conn. App. 182. The state challenges both of those conclusions on appeal. Although we agree with the Appellate Court that polygraph pretest interview evidence is not per se inadmissible under *Porter* and, therefore, that the video was improperly excluded on that basis, we conclude that any error in the exclusion of the video was harmless.

We begin by briefly summarizing the procedural history relevant to this issue, which was set forth in full by the Appellate Court. Prior to trial, the state filed a motion in limine seeking to exclude all testimony or evidence pertaining to the polygraph examination of any witnesses. Defense counsel opposed the motion, arguing that he intended to offer, among other things, a ninety minute videotape showing the standard pretest interview that the polygrapher, state police Trooper Tim Madden, had conducted with Allain prior to performing Allain's polygraph test in 2004. Defense counsel stated that he would seek to offer the videotape on the ground that it showed Madden giving Allain numerous assurances that Allain would receive favorable treatment if he cooperated with the police, which, defense counsel argued, "raises questions . . . about whether this young man is coming into this courtroom with the intention to do anything other than save himself."

The trial court ruled that the videotape was inadmissi-

ble. The court's oral ruling appeared to adopt the state's argument that a recording of a pretest interview or, indeed, any reference to the fact that a polygraph examination has been conducted, constitutes polygraph evidence and is, therefore, per se inadmissible. The court did, however, indicate that it would permit defense counsel to cross-examine Allain regarding "any promises or benefits that were made to him during the course of that interview."

A

We first consider whether the trial court properly determined that the videotape of Allain's pretest interview was not admissible for any purpose because it constituted "polygraph evidence," which we have held to be per se inadmissible. See *State* v. *Porter*, supra, 241 Conn. 93–94. This presents a question of law that we review de novo. See, e.g., *State* v. *Saucier*, 283 Conn. 207, 218, 926 A.2d 633 (2007).

In granting the state's motion in limine to exclude the pretest interview videotape, the trial court relied solely on *Porter*, concluding that the videotape constituted polygraph evidence. Accordingly, we shall confine our analysis to the question of whether the per se ban on the admission of polygraph evidence articulated in *Porter* extends to evidence of the conduct of the polygrapher and the witness during the pretest interview process.

The Appellate Court concluded, and we agree, that the phrase "polygraph evidence," as used in *Porter*, does not encompass documentation of the pretest interview process. *State* v. *Leniart*, supra, 166 Conn. App. 182. As the Appellate Court recognized, the question before this court in *Porter* simply was whether we should abandon the existing rule regarding the inadmissibility of (1) the *results* of polygraph tests and (2) the willingness of a witness to submit to such a test. Id., 190–91. In *Porter*, we characterized that rule as follows: "This court has repeatedly held that neither the results of a polygraph test nor the willingness of a witness to take such a test is admissible in Connecticut courts." (Internal quotation marks omitted.) *State* v. *Porter*, supra, 241 Conn. 93. Thus, our holding in *Porter* was limited to barring the results of a polygraph test and the willingness of a witness to undergo such a test.

We also are not persuaded by the state's argument that, because the pretest interview is an integral component of a polygraph examination, evidence of what transpired during the interview must be subject to the same per se rule as are examination results. Rather, we agree with the Appellate Court that we used the term "polygraph evidence" narrowly in *Porter*, as a shorthand reference only to the specific types of evidence the admission of which was at issue in that case, namely, evidence showing test results and a witness' willingness

to submit to a polygraph test.

Thus, we agree with the Appellate Court that polygraph pretest interview evidence does not constitute "polygraph evidence" for purposes of *Porter* and is not, therefore, per se inadmissible. Accordingly, it was for the trial court, in the exercise of its discretion and in light of the facts of this particular case, to determine whether admission of part of Allain's pretest interview would have been more probative than prejudicial. To the extent that the trial court failed to make such a determination, exclusion of the entire videotape was improper.

## B

Having concluded that the trial court incorrectly determined that the videotape of Allain's pretest interview constituted inadmissible polygraph evidence, we must consider whether the Appellate Court correctly concluded that that error was harmful.[25] The Appellate Court recognized that, during his cross-examination of Allain, defense counsel was able to establish both that Allain had powerful incentives to cooperate with the state in implicating the defendant and that Allain had changed or augmented various aspects of his story on a number of occasions. *State* v. *Leniart*, supra, 166 Conn. App. 195–96. Nevertheless, the Appellate Court found that the failure to admit the videotape substantially affected the verdict because (1) the videotape would have provided more direct evidence of Allain's motive and bias to implicate the defendant, including "the subtle but significant pressure placed on Allain by law enforcement," and (2) the jury was deprived of the opportunity to understand that the pretest interview was conducted in the context of a polygraph examination, which was significant to the defendant's claim. Id., 196–97. Although it is a close call, we are not persuaded that the defendant has met his burden of demonstrating that exclusion of the videotape substantially affected the verdict.

## 1

We begin by setting forth the well established standards that guide our review. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [A] nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Rodriguez*, 311 Conn. 80, 89, 83 A.3d 595 (2014).

## 2

The following additional facts and procedural history are relevant to this issue. Madden's pretest interview of Allain lasted for approximately ninety minutes. For the first thirteen minutes or so, Madden and Allain discussed Allain's reasons for submitting to the polygraph.

Specifically, a question arose as to whether Allain was taking the test voluntarily, because he believed that assisting the state was the right thing to do or, rather, because he was facing a potential five year sentence for having violated his probation through a failed drug test and had been led to believe that the state might not pursue a conviction if he cooperated in this matter. Allain initially indicated that he had consented to the polygraph primarily to avoid the conviction for violating his probation. Madden promptly explained, in no uncertain terms, that he could not perform the polygraph on those terms. Thus, before proceeding, Madden obtained from Allain a statement that he was participating freely.

The remainder of the pretest interview consisted of Madden's asking Allain a series of background questions, reviewing the statements that Allain had given to the police and Allain's accounts of the events surrounding the victim's disappearance, and explaining the questions that Allain would be asked during the polygraph. During that time, Madden repeatedly emphasized how "unbelievably important" it was for Allain to give completely truthful answers during the examination.

Moreover, Madden consistently equated truthfulness with successfully passing the test, doing "the right thing," and being a reliable witness. He emphasized in this respect that the state would consider Allain to be a useful witness, and Allain would qualify for potentially favorable treatment, only if the polygraph results demonstrated that Allain was being completely truthful and forthcoming. Madden referred several times during the interview to the investigation of the 1997 gang rape and murder of Maryann Measles. He informed Allain that suspected participants in that crime who *truthfully* confessed their roles and then passed polygraph examinations were let off with "a slap on the wrist," whereas suspected participants who failed polygraph tests were aggressively prosecuted.

At several points during the interview, Madden made comments indicating that the police were interested in obtaining Allain's cooperation. In particular, Madden explained that the police were interested in having Allain on their "team" rather than on the defendant's team, and in procuring Allain's assistance in "getting" the defendant, whom Madden described as the "bigger fish." In each instance, however, he made clear that Allain could provide such assistance only by giving completely truthful testimony and passing the polygraph test. Madden indicated, for example, that, if Allain failed the polygraph, then he would be on the "other team," aligned with the defendant, rather than "on our team." In other words, Madden made clear that only truthful statements would help Allain.

Throughout the interview, Madden made comments that gave the impression that he believed that Allain had not been completely forthcoming in his prior state-

ments to the police and that Allain still had something to "get off [his] chest." In a few instances, Madden speculated that Allain felt intimidated or frightened by the defendant. In most instances, however, Madden appeared to believe that what Allain was withholding was the extent of his own involvement in the crime. Madden even suggested that this might be a cause of Allain's diagnosed clinical depression and speculated that Allain, by telling the complete truth, might find some relief. It is clear to us, then, that introduction of the videotape into evidence would not have significantly weakened the state's case. See *State* v. *Rodriguez*, supra, 311 Conn. 89 (import of excluded evidence was important factor in assessing harmlessness).

After the trial court ruled the videotape inadmissible, the state called Allain to testify. The prosecutor began his direct examination by eliciting that Allain was then serving a ten year sentence for felony sexual assault involving a different victim, and that Allain was hoping for "leniency" in connection with that sentence in exchange for his cooperation with the state and testimony against the defendant in the present matter. Allain acknowledged that "it would be nice" to receive some consideration in exchange for his testimony.

On cross-examination, defense counsel effectively developed all of the basic facts and themes that the defendant sought to establish through use of the pretest interview videotape. Defense counsel was able to demonstrate that Allain was generally unreliable as a witness. For example, defense counsel repeatedly returned to the theme that Allain had two powerful incentives to cooperate with the state in convicting the defendant, namely, to divert attention from himself as a suspect in the victim's murder and to obtain a reduction of the sentence that he was then serving for sexual assault. With respect to the former, Allain admitted to having raped the victim on the night she disappeared and to having concealed that information from the police until after the statute of limitations for rape had expired. He also understood, however, that the statute of limitations for a felony murder never runs.

Allain also acknowledged that he had found and concealed the victim's shoe the day after she disappeared, and that this could make him an accessory to her murder. He also admitted to telling the police that he had previously indicated to the defendant that he was willing to kill the victim, and that he later told his father that he was involved in the victim's murder and that he needed help moving her body.[26] Allain admitted that he was concerned because, if the police believed that he had anything to do with the victim's death, he still could be charged with capital felony, and he believed that he would face a likely death sentence if convicted. At the same time, Allain, without expressly mentioning the pretest interview, testified that Madden had repeat-

edly told him that even someone who had been involved in rape and murder "could walk away . . . with a slap on the hand" if they cooperated with the police.[27] Accordingly, the jury was aware that Allain was a potential suspect in the victim's murder, that he had implicated himself in the murder, and that he understood that he could be charged with the crime if the defendant were exonerated.

The jury also heard testimony suggesting that there was an implicit agreement between Allain and the state that he would receive leniency on his sexual assault sentence if he fully cooperated with the state in this matter and if his cooperation proved sufficiently helpful. Allain twice acknowledged that, at the time he was sentenced on that conviction, the state's attorney had indicated that the state would not oppose a motion for sentence modification at a later date if Allain met certain unstated requirements. Allain testified that he understood that to mean that he might be allowed to serve less time if he "played ball" and cooperated in the defendant's case.

At several points, Allain expressed hope that the state would believe that he had provided substantial assistance in the case against the defendant and that, if his cooperation was sufficiently valuable, he would be released from prison early. Indeed, Allain complained that he had been "blackmailed" by the state and that an especially long sentence had been imposed for the sexual assault conviction specifically to ensure that he assisted the state in the defendant's case.

Accordingly, the jury learned through cross-examination that Allain felt pressured to cooperate and that he hoped that the state would deem his help sufficiently valuable that he would obtain a sentence modification. See *State* v. *Rodriguez*, supra, 311 Conn. 89 (opportunity to bring out content of excluded evidence on cross-examination was important factor in assessing harmlessness). Even though all of the basic facts and themes that the defendant sought to show to the jury through the pretest interview videotape were effectively elicited during Allain's cross-examination, the Appellate Court concluded that the defendant had met his burden of proving that exclusion of the videotape had substantially affected the verdict. *State* v. *Leniart*, supra, 166 Conn. App. 197.

3

The conclusion of the Appellate Court was based on the dual determinations that (1) viewing the videotape would have given the jury a more direct and persuasive impression of Allain's bias and motives, and of the pressures he was under to implicate the defendant, than could have come out through cross-examination, and (2) the fact that the interview took place in the specific context of a polygraph examination was criti-

cally important to the ability of the jury to assess the credibility of the state's key witness. Id., 196–97. We consider each point in turn.

a

Our analysis is guided by the principle that "[t]he credibility of a witness may be impeached by evidence showing bias for, prejudice against, or interest in any person or matter that might cause the witness to testify falsely." Conn. Code Evid. § 6-5. "Because evidence tending to show a witness' bias, prejudice or interest is never collateral . . . impeachment of a witness on these matters may be accomplished through the introduction of extrinsic evidence, in addition to examining the witness directly." (Citation omitted.) Conn. Code Evid. § 6-5, commentary. "However, otherwise [r]elevant [impeachment] evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Brown*, 273 Conn. 330, 342, 869 A.2d 1224 (2005); see also Conn. Code Evid. § 4-3.

Our impression of the videotape, and what the jury likely would have gleaned therefrom, differs from that of the Appellate Court. It is true that the first portion of the pretest interview does not cast the polygrapher in an especially favorable light. One could view the videotape and conclude that Madden disregarded Allain's clear statement that he believed that he was being coerced into taking the polygraph test, and that Madden coaxed Allain into saying the magic words that would allow the interview to proceed while permitting Allain to obtain the benefits that he sought.

Equally apparent, though, is the diligence with which Madden conducted the remainder of the interview. At the outset, having ascertained that Allain suffers from depression, Madden offered Allain numerous opportunities to terminate the interview if Allain believed that it might exacerbate his condition. More importantly, although Madden repeatedly encouraged Allain to cooperate with the state, cooperation was never framed in terms of implicating the defendant, inventing stories, or testifying *falsely* for the state. Rather, Madden repeatedly, consistently, and expressly instructed Allain that cooperation consists of *telling the truth*. In fact, on more than one dozen occasions, Madden emphasized to Allain the importance of telling the complete truth and that only truthful testimony would be of assistance to the state or advantageous to Allain. Likewise, two other officers who briefly questioned Allain during the interview encouraged Allain to be completely truthful, at one point telling him that "we don't want you to tell us what you think we want to hear."

Although this point is not discussed in the Appellate Court opinion, it is critically important. Although Allain's motivation for *participating* in the state's investigation and prosecution of the defendant may have been of some interest to the jury, jurors' primary concern must have been his veracity—whether he had been pressured or induced to fabricate his account of the defendant's confessions. Allain's trial testimony itself provided the strongest evidence that he might have reason not only to cooperate with the state but also to actively help the state to convict the defendant. During cross-examination, for example, Allain conceded that he hoped "that the state believes that [he] provided substantial assistance in [its] case against [the defendant] . . . ." He also expressed his hope that "the state agrees that [his] cooperation in this case was valuable enough" to obtain a sentence modification.

By contrast, even defense counsel, in arguing to the trial court the importance of the videotape, emphasized that the polygrapher's primary focus was to encourage Allain to testify truthfully: "Insofar as this witness was taken, isolated for a period of ninety minutes, badgered in my view into being told about all the benefits of cooperation, *about the need to be truthful*, about everything he stood to gain up to and including a potential walk—that . . . rate[s] a powerful argument that this young man may have been promised more than a year or two off *if he tells the truth*." (Emphasis added.)

For this reason, we disagree with the Appellate Court that the videotape provided the most compelling evidence that Allain had an undisclosed bias against or motive to implicate the defendant. At trial, Allain himself freely admitted that he had powerful incentives to cooperate with the state and to assist in convicting the defendant. If anything, the videotape, with its constant emphasis on the importance of truthfulness, undercuts that narrative. The themes that the Appellate Court found most troubling—Madden's desire to keep Allain on his team so as to catch "the big fish"—are embodied in just a few brief comments made in the course of a ninety minute interview, all of which are expressly linked to the "unbelievably important" need for Allain to be completely truthful.

We also do not share the Appellate Court's concern that "the jury could reasonably conclude from the videotape that Madden attempted to shape Allain's story about the defendant's actions on May 29, 1996, in order to make it more plausible." *State* v. *Leniart*, supra, 166 Conn. App. 195. It is true that, during the pretest interview, Madden and the other officers pointed out a few aspects of the defendant's story that they found difficult to believe. They found Allain's story implausible, for example, on the point that the victim had not said anything at all when the defendant approached and began having sex with her. Also, after Allain

amended his statement to include the fact that he had found and disposed of the victim's shoe before meeting with the defendant on the day after the assaults, the officers questioned whether that discovery would not have altered the tone of the ensuing conversation with the defendant as Allain initially had reported it. We have not identified any instance, however, in which it appeared that Madden or other officers were attempting to help Allain to more plausibly implicate the defendant. Rather, the clear subtext to the entire interview was that Madden believed that Allain had not come clean with respect to his own role in the victim's murder.[28]

b

We also do not share the Appellate Court's concern that cross-examination in this case was an inadequate substitute for the videotape. The Appellate Court took issue with the fact that, although the jury was able to learn some of what had transpired during the interview and was made aware of Allain's incentives to falsely implicate the defendant, the jury was not informed that these events occurred in the specific context of a polygraph examination. *State* v. *Leniart*, supra, 166 Conn. App. 196.

Although the Appellate Court frames the importance of the videotape in terms of having occurred in the context of a polygraph examination, the court's explanation primarily addresses the content of the videotape rather than the context. But, as we already have discussed, the handful of potentially troubling statements that the Appellate Court highlights were made by Madden over the course of a ninety minute interview in which he consistently emphasized that Allain would be of assistance to the state, and eligible for the benefits attendant to that assistance, only if he were completely truthful. Moreover, all of Madden's statements to that effect either were, or could have been, elicited by defense counsel on cross-examination.

Unlike the Appellate Court, we fail to see the significance of the fact that the pretest interview took place in the specific context of a polygraph examination. If anything, that context would appear to undermine the defendant's position. At the time of the polygraph, Allain already had implicated the defendant in the victim's murder on several occasions. Madden's clear purpose in the interview was not to encourage Allain to implicate the defendant, which he already had done, but, rather, to impress on Allain the importance of fully disclosing all details, including his *own* role in the victim's disappearance. Madden repeatedly indicated that the state would be able to depend on Allain's credibility as a witness only if Allain was completely forthcoming during the polygraph test. Accordingly, we do not think the jury reasonably could have gleaned from the videotape that the police were pressuring or incentivizing Allain either to falsely implicate the defendant in the

victim's murder or to hew to the inculpatory statements that he previously had given.

To summarize, all of the themes that the defendant sought to develop by way of the videotape were adequately brought out during cross-examination and, if anything, viewing the videotape in context would have undermined the defendant's theory that Allain had been pressured to implicate the defendant falsely. See *State* v. *Rodriguez*, supra, 311 Conn. 89 (likely impact on jury is central factor in assessing harmlessness). We further emphasize that, despite the lack of a body, the state's case against the defendant was strong, as it involved four independent witnesses who testified that the defendant had admitted to killing the victim. See id. We therefore conclude that any error by the trial court in excluding the pretest interview videotape was harmless.

## III

## EXCLUSION OF EXPERT TESTIMONY

We next consider whether the Appellate Court correctly concluded that the trial court had abused its discretion in precluding the testimony of Alexandra Natapoff, a law professor whom the defendant offered as an expert on the use, and questionable credibility, of incarcerated informants as witnesses in criminal prosecutions. The state contends, and we agree, that the trial court did not abuse its discretion when it determined that Natapoff's testimony would not have assisted the jury in this case. We therefore conclude that the Appellate Court incorrectly determined that the trial court had abused its discretion in precluding that testimony.

## A

The following procedural history is relevant to this issue. Prior to trial, the state filed a motion in limine seeking to preclude Natapoff's testimony. The state argued that expert testimony regarding the dubious credibility of jailhouse informants would (1) address matters within the common knowledge of the jury, (2) be more prejudicial than probative, and (3) invade a core function of the jury, namely, assessing the credibility of witnesses. At trial, the state renewed its objection, and Natapoff proffered the testimony outside the presence of the jury.

After establishing her bona fides as an expert on the subject of jailhouse informants,[29] Natapoff testified that the use of such informants in criminal prosecutions is pervasive, with prosecutors and the police offering, and inmates seeking, an array of benefits in exchange for incriminating testimony. She explained that the informant testimony acquired in this "marketplace" is "sometimes" untruthful and, in fact, is a significant source of wrongful convictions. Natapoff further testified that informants can be quite "entrepreneurial," using various methods to obtain information about

another inmate's case and to fabricate believable, incriminating stories. For example, inmates may rely on jailhouse gossip, steal files from other inmates, obtain case information from newspapers and media reports, or simply cooperate with other inmates to invent and validate each other's stories. Natapoff also expressed doubts as to whether the usual methods used to instruct and warn juries to be cautious about informant testimony are effective in preventing false convictions arising from the use of criminal informants.

Natapoff further described the marketplace for jailhouse informant testimony as "secretive" and testified that the public learns little about how the criminal justice system uses informants. She opined that the public is not familiar with jailhouse culture and is unaware of how infrequently dishonest informants are prosecuted for perjury. She also acknowledged, however, that several magazines have done exposés on the abuses associated with the use of jailhouse informants and that the practice is now well understood "outside" of correctional facilities.

On cross-examination, Natapoff conceded that studies regarding the use of jailhouse informants are largely limited to capital cases and that, even in those cases, it is impossible to know how many wrongful convictions have occurred as a result. The most she could say by way of quantification is that estimates of the share of wrongful convictions in capital cases range from 1 to 10 percent and that informant testimony was a factor in 20 to 45 percent of those cases—so between 0.2 and 4.5 percent of all capital convictions. She also described one study that concluded that criminal informant testimony was responsible for approximately 20 percent of all wrongful convictions in California. Natapoff acknowledged, however, that the problems associated with criminal informant testimony are not uniform throughout the country and that she had not studied Connecticut and was not aware of any particular customs and practices in Connecticut or, specifically, in New London. At no time did she opine as to what percentage of criminal informants testify untruthfully, either in Connecticut or elsewhere.

Natapoff further conceded that she had never testified before a jury. In fact, she was aware of only two cases in the country in which experts had been permitted to testify regarding the use of criminal informants, one in Wyoming and one in Louisiana. Moreover, although she wrote a book on the subject of criminal informants in which she offered various proposals for reforming the system and preventing the abuses associated with dishonest informants, Natapoff admitted that she had not recommended the use of expert testimony as a prophylaxis. She also could not say whether stricter regulation of the use of criminal informants had reduced the number of wrongful convictions in Los Angeles, a

city that is closely associated with the use and abuse of jailhouse informant testimony.

After permitting additional argument by the parties, the trial court granted the state's motion in limine and precluded Natapoff's testimony. The court articulated three rationales for its decision.

First, the trial court concluded that allowing testimony as to the credibility of jailhouse informants would be improper because credibility determinations are within the exclusive province of the jury. Second, the court found that, although Natapoff referenced certain research about which the jury might not be aware, her central conclusions—the marketplace for information and informants' incentives to testify falsely—were not outside the ken of the average juror. Third, the court emphasized that it had given the defense wide latitude in cross-examining the state's witnesses regarding any consideration they might receive for their testimony and that it intended to instruct the jury regarding the credibility of incarcerated witnesses in accordance with *State* v. *Arroyo*, 292 Conn. 558, 569, 973 A.2d 1254 (2009) (jailhouse informant testimony is inherently suspect and warrants special jury instruction), cert. denied, 559 U.S. 911, 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010).[30] The Appellate Court, unpersuaded by these rationales, reversed. That court held that "expert testimony concerning the reliability of informant testimony should be admitted if the court . . . determines that the expert is qualified and the proffered testimony is relevant to the specific issues in the case." *State* v. *Leniart*, supra, 166 Conn. App. 212.

B

We begin by setting forth the well established legal principles that govern this claim. "The trial court has wide discretion in ruling on the qualification of expert witnesses and the admissibility of their opinions. . . . The court's decision is not to be disturbed unless [its] discretion has been abused, or the error is clear and involves a misconception of the law. . . . Generally, expert testimony is admissible if (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks omitted.) *State* v. *Taylor G.*, 315 Conn. 734, 760, 110 A.3d 338 (2015); see also Conn. Code Evid. § 7-2. "It is well settled that [t]he true test of the admissibility of [expert] testimony is not whether the subject matter is common or uncommon, or whether many persons or few have some knowledge of the matter; but it is whether the witnesses offered as experts have any peculiar knowledge or experience, not common to the world, which renders their opinions founded on such knowledge or experience any aid to the court or the jury in determining the questions at

issue. . . . Implicit in this standard is the requirement . . . that the expert's knowledge or experience . . . be directly applicable to the matter specifically in issue." (Internal quotation marks omitted.) *State* v. *Guilbert*, 306 Conn. 218, 230, 49 A.3d 705 (2012).

We also have explained that "[t]he determination of the credibility of a witness is solely the function of the jury. . . . It is the trier of fact [that] determines the credibility of witnesses and the weight to be accorded their testimony. . . . Expert witnesses cannot be permitted to invade the province of the jury by testifying as to the credibility of a particular witness or the truthfulness of a particular witness' claims." (Internal quotation marks omitted.) *State* v. *Taylor G.*, supra, 315 Conn. 760–61.

### C

As previously noted, the trial court precluded Natapoff's testimony on several different grounds. We agree with the Appellate Court that the trial court incorrectly concluded that Natapoff's testimony would have invaded the exclusive province of the jury by assessing the credibility of the state's witnesses. *State* v. *Leniart*, supra, 166 Conn. App. 224. We do not agree, however, that the trial court abused its discretion in concluding that that Natapoff's testimony was largely within the ken of the jurors. Id., 227–28.

### 1

We have had a number of opportunities to consider whether the admission of expert testimony as to the credibility and tendencies of a certain class of witnesses would improperly usurp the role of the jury. See, e.g., *State* v. *Taylor G.*, supra, 315 Conn. 734 (minor victims of sexual abuse); *State* v. *Favoccia*, 306 Conn. 770, 51 A.3d 1002 (2012) (same); *State* v. *Guilbert*, supra, 306 Conn. 218 (eyewitnesses to crime); *State* v. *Ali*, 233 Conn. 403, 660 A.2d 337 (1995) (female victims of sexual assault); *State* v. *Borrelli*, 227 Conn. 153, 629 A.2d 1105 (1993) (battered women syndrome). In those cases, we have drawn a critical distinction between expert testimony that merely explains the behaviors or underlying neuropsychology typical of the class of witnesses at issue, and testimony that applies that knowledge so as to pass judgment—directly or indirectly—on the veracity of particular witnesses. We consistently have held that, although the former type of testimony is admissible if the trial court concludes that it otherwise satisfies the standards for expert testimony; see part III B of this opinion; testimony that speaks to the credibility of specific witnesses typically is inadmissible insofar as it invades the exclusive province of the jury. See, e.g., *State* v. *Taylor G.*, supra, 761–65; *State* v. *Favoccia*, supra, 787–90; *State* v. *Ali*, supra, 432–33; *State* v. *Borrelli*, supra, 173–74; *State* v. *Spigarolo*, 210 Conn. 359, 378–79, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S.

Ct. 322, 107 L. Ed. 2d 312 (1989). Accordingly, although the jury is free to apply an expert's generic testimony about a class of witnesses to the specific witnesses who testify in a particular case, an expert may not connect those dots for the jury.

In the present case, Natapoff intended to testify only with respect to the general characteristics of the marketplace for criminal informant testimony and the academic research indicating that unreliable informant testimony contributes to many wrongful convictions. During argument on the state's motion, defense counsel represented to the trial court that Natapoff had no knowledge about this particular case and that she was not familiar with, and did not intend to comment on, the testimony of any of the state's witnesses. Expert testimony about the behavior of jailhouse informants as a class is not per se inadmissible.[31] For this reason, we agree with the Appellate Court that the trial court incorrectly concluded that Natapoff's testimony would have invaded the province of the jury. *State* v. *Leniart*, supra, 166 Conn. App. 222–24.

2

We next consider whether the trial court abused its discretion when it determined that Natapoff's primary conclusions were not of assistance to the jury. We have explained that expert testimony is required only when a disputed matter is "*manifestly* beyond the ken of the average trier of fact, be it judge or jury." (Emphasis added.) *State* v. *McClary*, 207 Conn. 233, 245, 541 A.2d 96 (1988). At the other extreme, "[w]hen inferences or conclusions are so obvious that they could be as easily drawn by the jury as the expert from the evidence, expert testimony regarding such inferences is inadmissible." *State* v. *Iban C.*, 275 Conn. 624, 639, 881 A.2d 1005 (2005). It also is well established that expert testimony should be admitted only when the expert's knowledge or experience is directly applicable to a matter specifically at issue. *Sullivan* v. *Metro-North Commuter Railroad Co.*, 292 Conn. 150, 159, 971 A.2d 676 (2009); see also Conn. Code Evid. § 7-2.

We are not aware of any studies supporting Natapoff's testimony that the typical juror may not be familiar with the full scope of the marketplace for jailhouse informant testimony, the specific means by which inmates can fabricate believable incriminating stories, the panoply of incentives that the state is able to offer in exchange for such testimony, and the lack of any meaningful deterrent for an inmate who is willing to commit perjury. However, even if we were to assume, for the sake of argument, that Natapoff is correct that the typical juror is not aware of the full spectrum of risks that attend to the use of jailhouse informants, we would conclude for the following three reasons that the trial court did not abuse its discretion in precluding her testimony.

First, the trial court was free to credit Natapoff's own testimony that, although jurors may not be familiar with all of the nuances of the academic research in this field, the fundamental concerns regarding the reliability of criminal informant testimony have been exposed by the media and are well understood outside of the jailhouse. Natapoff's testimony in this regard is consistent with our own understanding of the issue. Although we disagree with the Appellate Court that the state was obliged to provide "empirical studies" to demonstrate that Natapoff's opinions are within the knowledge of the average layperson; *State* v. *Leniart*, supra, 166 Conn. App. 224; we observe that the potential abuses associated with jailhouse informant testimony have been explored by investigative journalists and are generally engrained throughout the popular culture.[32]

Indeed, one federal court facing a similar question recently cited to the Appellate Court's decision in this case, finding it unpersuasive for precisely this reason. See *United States* v. *Noze*, 255 F. Supp. 3d 352, 354 (D. Conn. 2017), aff'd sub nom. *United States* v. *Dugue*, 763 Fed. Appx. 93 (2d Cir. 2019). In that case, the defendants proposed to call an expert who, like Natapoff, would have testified as to the questionable credibility of cooperating witnesses. Id., 353. Judge Jeffrey A. Meyer explained that he was unpersuaded by the Appellate Court's reasoning because, among other things, "I think juries already understand that jails are miserable places. Juries understand that cooperating witnesses have committed crimes and have powerful motives to say what they can to stay out of or to be released from jail. I am not convinced that juries need a law professor to teach them more about the 'true culture of jails.' " Id., 354; see also *State* v. *Woods*, Docket No. C-130413 (LHH), 2014 WL 4437733, *7 (Ohio App. September 10, 2014) (testimony was not beyond knowledge of jury), appeal denied, 142 Ohio St. 3d 1422, 28 N.E.3d 121, cert. denied U.S. , 136 S. Ct. 420, 193 L. Ed. 2d 329 (2015).

Second, and perhaps more significantly, the defendant's proffer failed to establish that any of the specific information of which the jury might not have been aware is directly applicable to the present case. Unlike in cases such as *State* v. *Guilbert*, supra, 306 Conn. 226–27, in which the expert testimony at issue addressed neuropsychological traits that can be expected to apply to most, if not all, individuals, Natapoff's testimony hinged to a significant extent on research into the practices that are common to certain correctional facilities and the procedures that are used by certain prosecutor's offices in states such as California. Natapoff readily conceded that these practices and procedures are not uniform throughout the country and, further, that she had not studied whether and to what extent they are present in Connecticut. She was unable to say, for example, whether there is a significant possibility that an

informant who lies under oath in a Connecticut trial will be prosecuted for perjury; nor could she speak to the specific benefits that the witnesses in this action might reasonably have expected to receive.

Moreover, in the cases in which we have allowed experts to testify as to the credibility of a class of witnesses, the experts did not merely testify that certain witnesses are, generally, of dubious credibility. Rather, the experts provided the jury with a useful template, describing patterns of behavior typical of such witnesses so that jurors could better assess whether particular conduct or statements demonstrated veracity or mendacity. In *Guilbert*, for instance, the state's expert presented various factors that jurors could use to assess the accuracy of an eyewitness identification: the degree of stress to which the witness was exposed, the witness' prior familiarity with the person, "the length of time during which the eyewitness was able to observe the person, lighting, distance, and whether the eyewitness was paying attention." *State* v. *Guilbert*, supra, 306 Conn. 227.

Similarly, in our cases addressing the credibility of victims of domestic abuse, experts explained how such victims tend to delay reporting to the police, recant or provide inconsistent accounts of the abuse, and feel powerless to leave an abusive relationship. See, e.g., *State* v. *Taylor G.*, supra, 315 Conn. 755; *State* v. *Ali*, supra, 233 Conn. 429; *State* v. *Borrelli*, supra, 227 Conn. 167–70. In several instances, we emphasized that the defense had tried to impeach the complaining witness by highlighting delayed or inconsistent reporting of the alleged crime and that expert testimony was needed to rebut those arguments and to help jurors understand how conduct that might otherwise be thought to undermine a complainant's credibility is actually typical of victims of such crimes. See, e.g., *State* v. *Ali*, supra, 433; *State* v. *Borrelli*, supra, 170; *State* v. *Spigarolo*, supra, 210 Conn. 377.

In the present case, by contrast, Natapoff did not provide any template by which jurors could evaluate the testimony of jailhouse informants. She opined that some informants testify truthfully and others do not but did not offer any practical guidance as to how a jury might distinguish the former from the latter.

One could imagine a case in which Natapoff's testimony might prove helpful to a jury. If, for example, an informant witness claimed that a defendant had revealed details about a crime that would appear to be knowable only by the perpetrator, then learning that inmates often glean such information by reading their cellmates' legal files or from outside sources could be illuminating. Importantly, however, there is no suggestion in the present case that the state's witnesses testified as to any details of the crime that, while appearing to be knowable only by the perpetrator, could in fact

have been obtained via media reports or other means. Rather, Allain's statements and testimony were the only source of detailed information about the alleged crime, and he obtained that information from the defendant at the time of the murder, rather than during his later incarceration.[33] Moreover, as the defendant himself emphasizes, the testimony of Buckingham, Ching, and Douton, while confirming the general outlines of Allain's account, differed with respect to certain details of the alleged crime.

Ultimately, then, all a jury reasonably could glean from Natapoff's testimony is that it should be especially skeptical of any jailhouse informant, given the abundant opportunities and incentives to fabricate confession stories and the fact that jailhouse informants sometimes do in fact testify falsely, which results in wrongful convictions. But that is precisely how the trial court instructed the jury, and we must assume that the jury followed the court's instructions.[34] See, e.g., *State* v. *Booth*, 250 Conn. 611, 626, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000). In addition, although jurors may have entered the courtroom ignorant of some of this information, the problems that Natapoff described are readily understood and easily probed on cross-examination. For example, Douton conceded on cross-examination that he had followed the victim's case in the New London Day newspaper while incarcerated, that he had looked at the defendant's legal papers when they were in a holding cell together, and that, in exchange for his testimony, he hoped that the state would agree to modify his sentences to run concurrently rather than consecutively. Indeed, the prosecutor himself acknowledged to the jury in closing argument that "[a]ll these [prisoners] are hoping for consideration or most of them are hoping for consideration . . . ." Defense counsel also questioned the state's other witnesses on multiple occasions about any opportunities they may have had to read the defendant's legal papers or to collaborate. In short, it was not unreasonable of the trial court to conclude that, through common sense, the information presented at trial, and the court's instructions, the jurors would have already been familiar with any concepts presented in Natapoff's testimony that were directly and specifically applicable to this case.

Third, agreeing with the Appellate Court that expert testimony such as Natapoff's *must* be admitted in any case in which it is relevant—presumably any case in which the testimony of an informant plays more than a minimal role—would set a costly and troubling precedent. As one court has recognized, if defendants are allowed to put on experts who will testify as to the questionable credibility of criminal informants, then, surely, the state will want to parry with experts of its own. These counter experts would, undoubtedly, tell

the jury about the critical and generally reliable role that informants play in many criminal prosecutions. *United States* v. *Noze*, supra, 255 F. Supp. 3d 355. Criminal trials would devolve into expensive and time consuming "battles of [road show] experts . . . ." Id.

For these and other reasons, although Natapoff has been permitted to testify in one civil trial subsequent to the defendant's conviction; see *Larson* v. *State*, 194 Wn. App. 722, 731 n.5, 375 P.3d 1096, review denied, 186 Wn. 2d 1025, 385 P.3d 117 (2016); other courts generally have not permitted Natapoff or other experts to testify regarding the credibility of criminal informants. See *People* v. *Curl*, 46 Cal. 4th 339, 360, 207 P.3d 2, 93 Cal. Rptr. 3d 537 (2009) (trial court did not abuse discretion in precluding expert testimony on methods used by jailhouse informants to fabricate testimony), cert. denied, 559 U.S. 1009, 130 S. Ct. 1881, 176 L. Ed. 2d 369 (2010); *People* v. *Vega*, Docket No. G045613, 2013 WL 1736669, *8 (Cal. App. April 23, 2013) (Natapoff's testimony was properly excluded), review denied, California Supreme Court, Docket No. S210465 (June 26, 2013); *State* v. *Woods*, supra, 2014 WL 4437733, *7 (trial court did not abuse its discretion by excluding expert testimony when informant was cross-examined at length); see also *Servello* v. *Commissioner of Correction*, 95 Conn. App. 753, 763, 899 A.2d 636 (upholding habeas court's conclusion that expert testimony would not have assisted jury), cert. denied, 280 Conn. 904, 907 A.2d 91 (2006).

By contrast, in other instances in which we have allowed or required expert testimony as to the reliability of a class of witnesses, we relied on the fact that sister states routinely admit such evidence. See, e.g., *State* v. *Guilbert*, supra, 306 Conn. 233–39 and n.20 (eye witness testimony); *State* v. *Ali*, supra, 233 Conn. 434 (reporting delays by rape victims); *State* v. *Borrelli*, supra, 227 Conn. 170 (battered woman's syndrome); *State* v. *Spigarolo*, supra, 210 Conn. 377 (disclosure tendencies of sexually abused children). Accordingly, we are unable to say that the trial court abused its discretion in concluding that Natapoff would not have provided any expert information that was both directly applicable to the case at hand and beyond the ken of the average juror.[35]

The judgment of the Appellate Court is reversed with respect to the evidentiary claims at issue in the state's certified appeal and the case is remanded to that court with direction to consider the defendant's remaining claims on appeal; the judgment is affirmed in all other respects.

In this opinion ROBINSON, KAHN and VERTEFEUILLE, Js., concurred.

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

[1] For the sake of simplicity, we note that all references in this opinion to § 53a-54b are to General Statutes (Rev. to 1995) § 53a-54b, as amended by

Public Acts 1995, No. 95-16, § 4.

[2] In accordance with our policy of protecting the interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[3] Although Allain's testimony was unclear on this point, the jury reasonably could have concluded that the path on which Allain and the defendant spoke is the same path to which the defendant confessed having taken the victim.

[4] Judge Flynn, writing separately, concluded that the Appellate Court majority had, in some respects, improperly articulated and applied the corpus delicti rule, but he agreed that the defendant could not prevail on his corpus delicti claim. See *State* v. *Leniart*, supra, 166 Conn. App. 228 (*Flynn, J.*, concurring in part and dissenting in part).

[5] For the reasons discussed in part I B of this opinion, some courts and commentators refer to Connecticut's version of the corpus delicti rule as the corroboration rule.

[6] For brevity, subsequent references to "confessions" are intended to refer to the alleged extrajudicial confessions or admissions of a criminal defendant.

[7] Because we agree with the defendant that the corpus delicti rule is a hybrid rule that implicates his due process rights and, therefore, that his failure to object to admission of his alleged confessions does not preclude appellate review, we need not consider his alternative arguments that his corpus delicti claim is properly preserved or should be reviewed for plain error.

The defendant contends that there also is insufficient evidence to prove that he sexually assaulted, kidnapped, and intentionally killed the victim. Although those issues are not encompassed within the certified question, we note that Allain's testimony, if credited by the jury, and as corroborated by independent evidence, was sufficient to establish the essential elements of all of the charged crimes.

[8] Aside from the question of reviewability, the distinction determines the remedy that would be available to the defendant should he prevail on his corpus delicti claim. If the confession testimony were found to have been improperly admitted, then he would be entitled to a new trial, assuming that the error was not deemed harmless, whereas a finding that the state's evidence was insufficient to sustain a conviction would require his acquittal. See *Burks* v. *United States*, 437 U.S. 1, 16, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978); *State* v. *Ferrell*, 191 Conn. 37, 46, 463 A.2d 573 (1983).

[9] We note that it is not uncommon for substantive rules to have evidentiary implications as well. See, e.g., *Manderson* v. *Chet Morrison Contractors, Inc.*, 666 F.3d 373, 381 (5th Cir. 2012) (collateral source rule "can apply as evidentiary rule or as substantive rule of damages, or both"); *Strout* v. *Paisley*, Docket No. CIV. 00-107-B (MJK), 2000 WL 1900313, *4 (D. Me. December 4, 2000) ("any rule, whether [common-law] or statutory, may have both substantive and evidentiary components").

[10] As we discuss subsequently in this opinion, the nature of the burden imposed on the prosecution under the corpus delicti rule was later refined by this court in *State* v. *Tillman*, supra, 152 Conn. 20. See part I B 1 of this opinion.

[11] The Appellate Court believed that it was bound by *Uretek*, notwithstanding our subsequent decision in *State* v. *Farnum*, supra, 275 Conn. 26, because, in *State* v. *Heredia*, 139 Conn. App. 319, 325 and n.3, 55 A.3d 598 (2012), cert. denied, 307 Conn. 952, 58 A.3d 975 (2013), a different panel of the Appellate Court had announced that it would adhere to *Uretek* until that decision was expressly overruled by this court. See *State* v. *Leniart*, supra, 166 Conn. App. 161–62.

[12] See, e.g., *Langevin* v. *State*, supra, 258 P.3d 873; *People* v. *Konrad*, 449 Mich. 263, 269, 536 N.W.2d 517 (1995); *State* v. *Jones*, 427 S.W.3d 191, 195 (Mo. 2014).

[13] We note that McCormick on Evidence favors treating the rule as exclusively substantive. See 1 K. Broun, supra, § 145, p. 805. Other scholars, however, adopt the hybrid approach. See, e.g., T. Mullen, "Rule Without Reason: Requiring Independent Proof of the Corpus Delicti as a Condition of Admitting an Extrajudicial Confession," 27 U.S.F. L. Rev. 385, 386 and n.5 (1993).

[14] See D. Moran, supra, 64 Ohio St. L.J. 818 ("[t]he corpus delicti rule has fallen into disfavor in recent decades"); id., 835 ("the last half of the twentieth century has produced a distinct trend away from the corpus delicti rule" [internal quotation marks omitted]); T. Mullen, supra, 27 U.S.F. L. Rev. 389 (noting modern trend "reducing the quantum of evidence necessary to

establish the corpus delicti"); T. Mullen, supra, 418 ("[m]ost courts have acted with [half measures] to unburden themselves of the corpus delicti rule").

[15] Unless otherwise noted, we use the term "independent evidence" to refer to evidence independent of any purported admissions, confessions, or related extrajudicial statements of the accused.

[16] See T. Mullen, supra, 27 U.S.F. L. Rev. 389 and n.17 (listing Connecticut as one of only four states to adhere to narrower version of rule); see also *United States* v. *Woods*, 484 F.2d 127, 132 (4th Cir. 1973) (describing this view as " 'orthodox' " but noting that it has not found widespread acceptance), cert. denied, 415 U.S. 979, 94 S. Ct. 1566, 39 L. Ed. 2d 875 (1974).

[17] We note that, although the term corpus delicti, which literally translates to "body of the crime," has led to some confusion, it never has been the rule that a victim's body must be produced before the state can secure a murder conviction. See D. Moran, supra, 64 Ohio St. L.J. 828 and n.68; R. Perkins, "The Corpus Delicti of Murder," 48 Va. L. Rev. 173, 182 (1962). As has been long recognized and frequently remarked, such a rule would serve only to incentivize gangland style murders in which victim's bodies are incinerated, dissolved, or dumped in the sea. See *Virgin Islands* v. *Harris*, 938 F.2d 401, 415 (3d Cir. 1991) ("[A] murderer should not be entitled to acquittal simply because he successfully disposes of a victim's body. That is one form of success for which society has no reward." [Internal quotation marks omitted.]); *United States* v. *Gibert*, 25 F. Cas. 1287, 1290 (C.C.D. Mass. 1834) (No. 15,204) (requiring production of body "would amount to a universal condonation of all murders committed on the high seas").

[18] Although the Perry tale apparently boasts sufficient indicia of historical reliability to not be deemed apocryphal; see P. Clifford, The Campden Wonder, available at http://www.campdenwonder.plus.com/Sources.htm (last visited September 4, 2019); details of the story vary from one account to another. Compare *State* v. *Bishop*, 431 S.W.3d 22, 46 (Tenn. 2014), with A. Howard, Rope: A History of the Hanged (2016) pp. 145–46.

[19] M. Sullo, "Adult Missing Persons in Connecticut: Advocate Says Police Aren't Doing Enough," Middletown Press (December 18, 2011), available at https://www.middletownpress.com/news/article/Adult-missing-persons-in-Connecticut-Advocate-11876085.php (last visited September 4, 2019).

[20] See, e.g., D. Moran, supra, 64 Ohio St. L.J. 818–19.

[21] See *Miranda* v. *Arizona*, 384 U.S. 436, 471–74, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[22] We recognize that the record contains some troubling testimony and exhibits regarding James Butler, a former Marine and family friend of the victim, who claimed to have spoken with the victim at a video rental store in Virginia, some three years after her disappearance. However, Butler did not testify at trial, some questions were raised regarding his competence, and the police were unable to verify key elements of his story. Accordingly, and in light of the standard of review that governs this claim, we agree with the Appellate Court that we must assume that the jury declined to credit Butler's statement.

[23] We caution that the mere fact that more than one witness testifies that the accused has confessed to a crime is not, by itself, sufficient corroboration to satisfy the corpus delicti rule. See *Wong Sun* v. *United States*, 371 U.S. 471, 489–90 n.15, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963); see also *United States* v. *Northrup*, 482 F. Supp. 1032, 1037 (D. Nev. 1980) ("[i]f two admissions, in and of themselves, are untrustworthy, obviously they cannot be bootstrapped together to raise each other to the level of trustworthiness"); *State* v. *Doucette*, supra, 147 Conn. 100 ("[e]ven two positive confessions of guilt, without independent proof of the corpus delicti, would not be sufficient to authorize a conviction" [internal quotation marks omitted]).

[24] We note that the corpus delicti rule, as applied in Connecticut, governs confessions made to and reported by laypersons as well as law enforcement officers. See *State* v. *Farnum*, supra, 275 Conn. 33 (applying rule where defendant confessed crime to jailhouse informant); see also 1 K. Broun, supra, § 145, pp. 807–808. This reflects the fact that false confessions may result not only from the use of oppressive interrogation tactics by law enforcement but also from other causes—mental illness, publicity seeking, etc.—that may lead an individual to falsely confess to family, friends, cellmates, or even complete strangers.

[25] Because we conclude that exclusion of the videotape was not harmful error, we need not address the state's alternative argument that the trial court also made a reasonable, discretionary determination that the prejudicial impact of the videotape outweighed its probative value.

[26] Allain had previously repudiated that confession during his direct examination.

[27] Allain initially testified that he did not recall discussing that subject with Madden but ultimately acknowledged that, although he could not remember exactly what Madden had said, he did recall the discussion.

[28] Prior to asking Allain to review and verify his prior statements to the police, for example, Madden instructed him as follows: "[L]et's assume worst case scenario, worst case scenario you go look, [the defendant] was choking her and I was holding her feet. Not only did I witness him kill her, I helped restrain her. . . . [A]s long as it comes out prior to, you're going to pass the polygraph."

[29] The state does not dispute that Natapoff qualifies as an expert on these matters.

[30] Shortly after the trial court's ruling in this case, this court decided *State* v. *Guilbert*, 306 Conn. 218, 257–58, 49 A.3d 705 (2012), in which we held that, although expert testimony on the reliability of eyewitness identifications is presumptively admissible where relevant and directly applicable to the facts and circumstances of a case, a court does not abuse its discretion in precluding such testimony if cross-examination and focused, informative jury instructions provide an adequate substitute. We express no opinion as to whether the rule articulated in *Guilbert* should apply to expert testimony regarding the reliability of jailhouse informants.

[31] Although we conclude in part III C 2 of this opinion that, to the extent that Natapoff's testimony was directly applicable to the present case, it was not beyond the ken of the average juror, we do not foreclose the possibility that testimony on the practices and procedures governing criminal informant testimony in Connecticut could be presumptively admissible under other circumstances.

[32] See, e.g., N. Yarris, The Fear of 13 (Arrow Books 2017) c.4; 60 Minutes: Informant Says He Was Planted in Orange County Jail To Snitch (CBS television broadcast May 21, 2017), available at https://www.cbsnews.com/news/informant-says-he-was-planted-in-orange-county-jail-to-snitch (last visited September 4, 2019); Frontline: Snitch, How Informants Have Become a Key Part of Prosecutorial Strategy in the Drug War (PBS television broadcast January 12, 1999), available at https://www.pbs.org/wgbh/pages/frontline/shows/snitch/etc/script.html (last visited September 4, 2019); G. Cothran, "Trial by Liar," SF Weekly, January 14, 1998, available at https://www.sfweekly.com/news/trial-by-liar (last visited September 4, 2019); R. Reinhold, "California Shaken over an Informer: He Shows How To Fabricate a Prisoner's Confession," N.Y. Times, February 17, 1989, pp. A1, A17; see also *Goldstein* v. *Long Beach*, 715 F.3d 750, 758 (9th Cir. 2013) (referencing 60 Minutes broadcast from 1988).

[33] For this reason, among others, we are not persuaded by Justice Palmer's attempt to distinguish *United States* v. *Noze*, supra, 255 F. Supp. 3d 352.

[34] The court instructed the jury as follows: "In weighing the testimony of an accomplice who is a self-confessed criminal, you should consider that fact. It may be that you would not believe a person who has committed a crime as readily as you would believe a person of good character.

"In weighing the testimony of an accomplice who has not yet been sentenced or whose case has not yet been disposed of or who has not been charged with offenses in which the state has evidence, you should keep in mind that he may in his own mind be looking for some favorable treatment in the sentence or disposition of his own case or hoping not to be arrested.

"Therefore, he may have such an interest in the outcome of this case that his testimony may have been colored by that fact. Therefore, you must look with particular care at the testimony of an accomplice and scrutinize it very carefully before you accept it.

"There are many offenses that are of such a character that the only persons capable of giving useful testimony are those who are themselves implicated in the crime. It is for you to decide what credibility you will give to a witness who has admitted his involvement in criminal wrongdoing; whether you will believe or disbelieve the testimony of a person who by his own admission has committed or contributed to the crime charged by the state here. Like all other questions of credibility, this is a question you must decide based on all the evidence presented to you.

"Witnesses testified in this case as informants. An informant is someone who has information regarding the crime and agrees to testify in exchange for some benefit from the state. In evaluating an informant's testimony, you should consider the benefits that the state has promised the informant in exchange for his cooperation.

"It may be that you would not believe a person who is receiving benefits

in exchange for testimony as well as you might believe other witnesses. An informant may have such an interest in the outcome of this case that his testimony may have been colored by that fact.

"Therefore, you must look with particular care at the testimony of an informant and scrutinize it very carefully before you accept it. You should determine the credibility of that witness in the light of any motive for testifying falsely and inculpating the accused.

"If you find that the witness is an informant who has been promised a reduction in his sentence or other valuable consideration by the state in return for his testimony or who hopes for or expects consideration by the state in return for his testimony, you must decide whether you will believe or disbelieve the testimony of a person who is testifying in exchange for some benefit from the state. Like all other questions of credibility, this is a question you must decide based on all the evidence presented to you."

[35] Because the Appellate Court reversed the defendant's conviction on evidentiary grounds, it did not consider various constitutional challenges that he raised. *State* v. *Leniart*, supra, 166 Conn. App. 182 n.28, 212 n.39. On remand, the Appellate Court will have the opportunity to consider those claims in the first instance.

---